1  Evan F. Hiller (SBN 028214)
   hiller@sackstierney.com
2  SACKS TIERNEY P.A.
   4250 N. Drinkwater Blvd., 4th Floor
3  Scottsdale, AZ 85251-3693
   Telephone:  480.425.2600
4  *Attorneys for Plaintiff*

5

6

7

8              **IN THE UNITED STATES DISTRICT COURT**

9                **FOR THE DISTRICT OF ARIZONA**

10

11  Li Fen Yao, as Admin. of Estate of Sam
    M. Chen,                                    No.  CaseNumber
12
              Plaintiff,
13                                              **MEMORANDUM OF POINTS AND**
    v.                                          **AUTHORITIES IN SUPPORT OF**
14                                              **MOTION TO COMPEL COMPLIANCE**
    Robert Chen, Otter Audits LLC, and RC       **WITH SUBPOENA AS TO CASE NO.**
15  Security LLC,                               **8:23-CV-889-TDC, U.S. DISTRICT**
                                                **COURT OF MARYLAND, SOUTHERN**
16            Defendant.                        **DISTRICT**

17

18

19

20

21

22

23

24

25

26

27

28

*SACKS TIERNEY P.A., ATTORNEYS*
*4250 NORTH DRINKWATER BOULEVARD*
*FOURTH FLOOR*
*SCOTTSDALE, ARIZONA 85251-3693*

4090370

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ ii

PRELIMINARY STATEMENT ......................................................................... 1

STATEMENT OF FACTS ................................................................................. 2

    A.    The Estate's Claims ................................................................... 2

    B.    The Subpoena, Agasi's Objections, and Meet-and-Confer
    Discussions ............................................................................... 3

        1.    Documents Sought ....................................................... 3

        2.    Agasi's Objections ....................................................... 4

        3.    Meet and Confer Discussions ...................................... 5

ARGUMENT ..................................................................................................... 6

POINT I **THE DISCOVERY SOUGHT IS RELEVANT AND NOT
UNDULY BURDENSOME** ............................................................................. 6

    A.    The Discovery Sought Is Relevant ........................................... 7

    B.    Agasi Has Failed To Show That Compliance Is Unduly
    Burdensome ............................................................................... 8

    C.    Under the Circumstances, Petitioner Should Be Able To
    Obtain The Requested Discovery From Agasi And Not Be
    Limited To Obtaining It From Robert ...................................... 9

POINT II **NO ACCOUNTANT-CLIENT PRIVILEGE APPLIES** ......................... 10

POINT III **NO PRIVACY RIGHTS PREVENT PRODUCTION OF
RESPONSIVE DOCUMENTS** .................................................................... 15

CONCLUSION ................................................................................................ 16

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251–3693

i

4090370

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Advanced Reimbursement Solutions LLC v. Aetna Life Ins. Co.*,
5      2022 U.S. Dist. LEXIS 1161 (D. Ariz. Jan. 3, 2022) ...........................................................8, 9

6

*Andrich v. Kostas*,
7      2020 U.S. Dist. LEXIS 11150 (D. Ariz. Jan. 23, 2020) ...........................................................11

8
*Apex Mortg. Corp. v. Great Northern Ins. Co.*,
      2018 U.S. Dist. LEXIS 2811 (N.D. Ill. Jan. 8, 2018) ...............................................................11

9

*Aquastar Pool Prods. v. Paramount Pool & Spa Sys.*,
10      2019 U.S. Dist. LEXIS 8273 (D. Ariz. Jan. 16, 2019) ...............................................................7

11
*In re: Bard IVC Filters Prods. Liab. Litig.*,
      2016 U.S. Dist. LEXIS 97043 (D. Ariz. July 25, 2016)......................................................13, 14

12

*Bogard Constr., Inc. v. Oil Price Info. Serv., LLC*,
13      604 F. Supp. 3d 895 (N.D. Cal. 2022) .....................................................................................11

14
*Briggs v. Cty. of Maricopa*,
      2021 U.S. Dist. LEXIS 61386 (D. Ariz. Mar. 30, 2021) .......................................................7, 16

15

*Brown v. Superior Court*,
16      670 P.2d 725 (Ariz. 1983) .......................................................................................................14

17
*Bryant v. Silverman*,
      703 P.2d 1190 (Ariz. 1985) (en banc) .....................................................................................11

18

*Burlington Northern & Santa Fe Ry. v. United States Dist. Court*,
19      408 F.3d 1142 (9th Cir. 2005) ...........................................................................................14, 15

20
*Certain Underwriters at Lloyd's v. Morrow*,
21      2018 U.S. Dist. LEXIS 187194 (W.D. Ky. Nov. 1, 2018) .......................................................13

22
*City of Almaty v. Ablyazov*,
23      2018 U.S. Dist. LEXIS 242385 (S.D.N.Y. July 23, 2018) .......................................................11

24
*Davenport v. SP Jedi, Inc.*,
      2019 U.S. Dist. LEXIS 229314 (D. Ariz. Apr. 19, 2019) .......................................................15

25

26
*Evanston Ins. Co. v. Murphy*,
      2020 U.S. Dist. LEXIS 218817 (D. Ariz. Nov. 23, 2020).........................................................7

27

28

ii

4090370

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251–3693

*Fisher v. Mulligan,*
    2020 U.S. Dist. LEXIS 257249 (D. Wyo. July 31, 2020) ....................................... 12

*Fox v. State,*
    2022 U.S. Dist. LEXIS 227883 (D. Ariz. Dec. 19, 2022) ....................................... 9

*FTC v. Grand Canyon Educ. Inc.,*
    2024 U.S. Dist. LEXIS 214564 (D. Ariz. Nov. 22, 2024) ...................................... 7

*Gann v. GM LLC,*
    2022 U.S. Dist. LEXIS 148563 (D. Ariz. Aug. 18, 2022) ...................................... 15

*Home Indem. Co. v. Lane Powell Moss & Miller,*
    43 F.3d 1322 (9th Cir. 1995) ............................................................................ 11

*Kuhn & Kogan Chtd. v. Jeffrey C. Mensh & Assocs.,*
    77 F. Supp. 2d 52 (D.D.C. 1999) ..................................................................... 13

*Lange v. Penn Mut. Life Ins. Co.,*
    843 F.2d 1175 (9th Cir. 1988) .......................................................................... 11

*Lion Elec. Co. v. Nikola Corp.,*
    2024 U.S. Dist. LEXIS 165030 (D. Ariz. Sept. 13, 2024) .................................... 13

*In re Marriage of Irwin,*
    822 P.2d 797 (Wash. App. 1992) ...................................................................... 12

*Mi Familia Vota v. Fontes,*
    344 F.R.D. 496 (D. Ariz. 2023) ....................................................................... 15

*Mi Familia Vota v. Hobbs,*
    343 F.R.D. 71 (D. Ariz. 2022) ..................................................................... 9, 10

*Ocean Garden Prods. v. Blessings Inc.,*
    2020 U.S. Dist. LEXIS 152906 (D. Ariz. Aug. 24, 2024) .................................... 16

*R. Prasad Indus. v. Flat Irons Envtl. Solutions Corp.,*
    2014 U.S. Dist. LEXIS 84193 (D. Ariz. June 19, 2014) ....................................... 15

*R (Prudential plc and another) v Special Comm'r of Income Tax and another*
    [2013] UKSC 1 ............................................................................................. 12

*Renfield Corp. v. E. Remy Martin & Co., S.A.,*
    98 F.R.D. 442 (D. Del. 1982) .......................................................................... 13

*Skaninaviska Enskilda Banken AB (Publ), Singapore Branch v. Asia Pacific*
    *Breweries (Singapore) Pte Ltd*
    [2007] SGCA 9 ............................................................................................. 12

iii

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251–3693

*State v. O'Brien*,
    601 P.2d 341 (Ariz. Ct. App. 1979) ......................................................................14

*Stromberg v. Qualcomm Inc.*,
    14 F.4th 1059 (9th Cir. 2021) ..............................................................................11

*United States Aviation Underwriters, Inc. v. Eurocopter, S.A.S.*,
    2006 U.S. Dist. LEXIS 46451 (D. Ariz. July 7, 2006) ........................................12

*Weiss v. Nat'l Westminster Bank, PLC*,
    242 F.R.D. 33 (E.D.N.Y. 2007) ...........................................................................12

*Williams & Cochrane LLP v. REDW LLC*,
    2020 U.S. Dist. LEXIS 138296 (D. Ariz. Aug. 3, 2020) .................................9, 15

*Ziegler v. Polaris Indus. Inc.*,
    2022 U.S. Dist. LEXIS 207006 (W.D.N.C. Nov. 15, 2022) .................................11

**Statutes**

Ariz. Rev. Stat. Ann. § 32-749 ....................................................................................5, 12

R.C.W. § 5.60.060 ............................................................................................................12

R.C.W 18.04.405 ..............................................................................................................12

S.D. Stat. §§ 19-2-1 to 19-2-20 ......................................................................................12

S.D. Stat. §§ 19-19-501 to 19-19-516 ............................................................................12

S.D. Stat. § 47-13B-18 .....................................................................................................12

Wyo. Stat. § 1-12-101 ......................................................................................................12

**Rules**

Ariz. R. Civ. P. 45 ........................................................................................................4, 6

Fed. R. Civ. P. 1 ................................................................................................................6

Fed. R. Civ. P. 26 ..............................................................................................................7

Fed. R. Civ. P. 45 ............................................................................................................15

Fed. R. Evid. 501 .............................................................................................................11

**Regulations**

WAC § 4-30-050 ..............................................................................................................12

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251–3693

iv

4090370

**Other Authorities**

Restatement (Second) of Conflicts (1971) §139 ........................................................11, 12, 13, 14

9 Moore's Federal Practice §45.32 (Bender 3d ed.)........................................................9

23A Wright & Miller, Federal Practice and Procedure, §5435
    (1st ed. June 2024 Update) ...................................................................................11

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251–3693

v

4090370

**PRELIMINARY STATEMENT**

Petitioner is engaged in litigation in the District of Maryland with Robert Chen ("Robert"), who, with Sam Chen ("Sam") (no relation), were the sole members of OtterSec LLC ("OtterSec"). *See Yao v. Chen*, *et al.* No. 8:23-00889-TDC (D. Md. 2023) (the "Maryland Action"). On March 5, 2025, the Maryland Action was consolidated with a related case filed by Robert and OtterSec against David Chen ("David"), Sam's and Petitioner's son, *Chen et al. v. Chen*, No. 8:24- 03628-PX (D. Md. 2024). ECF #118. The Subpoena was issued prior to consolidation.[1]

The Estate's claims concern Robert's purported dissolution of OtterSec, and continuation of its business through entities that Robert formed in South Dakota: Otter Audits LLC and RC Security LLC (together, the "South Dakota LLCs"), who are co-defendants in the Maryland Action, and a Singaporean entity, Digital Asset Network Security PTE Ltd. ("DANS," collectively with the South Dakota LLCs, the "Successor Entities"). Robert executed this scheme by purportedly purchasing OtterSec's assets in violation of duties he owed to the Estate and OtterSec. More specifically, while serving as OtterSec's sole member and simultaneously acting on behalf of the South Dakota LLCs, Robert was the only bidder at an auction for OtterSec's assets and purported to purchase them from OtterSec for himself and for the benefit of the Successor Entities. The agreement memorializing Robert's purchase of OtterSec's assets was signed by Robert both on behalf of OtterSec as the seller, and by himself as the purchaser. Discovery has revealed that Agasi Tax & Financial, PLLC (hereafter "Agasi") was the accounting firm for at least OtterSec and the South Dakota LLCs.

The discovery Petitioner seeks via the Subpoena is relevant to (1) the scope and extent of OtterSec's assets and operations; (2) negotiations between Robert and Sam (and David) regarding OtterSec; (3) the purported dissolution of OtterSec and Robert's conflicted purchase of its assets at a steep discount; (4) the formation of the Successor Entities; and (5)

---

[1] References to the Maryland Action refer to the consolidated cases together. References to "ECF #__" are to the lead case docket, *Yao v. Chen, et al.*, unless otherwise noted.

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

the commingling of assets between Robert and the Successor Entities. The Subpoena requests easily searchable business records, posing a minimal burden. Yet Agasi has refused to cooperate in the meet-and-confer process, ignored follow up e-mails, and has failed to show any evidence of an undue burden.

Further, contrary to Agasi's objections, no privilege or privacy rights apply. First, under applicable law, the accountant-client privilege Agasi asserts on behalf of Robert and the Successor Entities does not apply. Second, any privilege has been waived because Robert, in the Maryland Action, has already produced some of the financial records and communications with Agasi that have been requested. Third, there is no recognized privacy right in the financial records at issue, and they are otherwise waived and outweighed by the necessity of the discovery Petitioner seeks.

Thus, Petitioner is entitled to this non-party discovery and Agasi should be ordered to produce the relevant, non-privileged records responsive to the Subpoena.

## STATEMENT OF FACTS

### A. The Estate's Claims

In February 2022, Petitioner's son David and Robert developed the idea for OtterSec but, because David was still a minor, his father Sam became the co-owner with Robert. *See* Declaration of Alexander G. Malyshev ("Malyshev Decl."), Ex. 1, *Yao v. Chen, et al.* Complaint (ECF #1), ¶¶15-16, 20-22.[2] Despite the company's success, Robert and David's relationship started to deteriorate in April 2022, when David learned that Robert had been deceptive in connection with his discussions about a potential acquisition of OtterSec and hiring of Robert and OtterSec employees (an "acquihire") by Jump Trading ("Jump"). *Id*. ¶¶29-40, 45-65, 83-88. After discovering this, David ceased work for OtterSec and Robert threatened to "dissolve the company and remake it" to exclude David and Sam from OtterSec's profitable business. *Id*. ¶¶70-77.

After Sam tragically passed away in a car accident, Robert carried out his plan. *Id*.

---

[2] Citations to "Ex.__" are all to the Malyshev Decl.

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

4090370

¶¶15, 97. He secretly formed the South Dakota LLCs on September 13, 2022. *Id.* ¶¶100, 104.

He then retained counsel to facilitate the dissolution and asset sale. *Id.* ¶¶82, 89-102; 105.

This included:

- Robert executing (in secret) on behalf of himself and OtterSec – a company with annualized revenue of approximately $5 million – an agreement on September 24, 2022 for Robert to purportedly purchase OtterSec's assets (and potential claims) for $210,000. *Id.* ¶¶102-03, 105, 109, 127, 129; *Chen, et al. v. Chen*, No. 8:24-cv-03628-PX (D. Md. 2024), Amended Compl., ECF#16. ¶¶8 n.1, 20, 114.

- Robert purporting to dissolve OtterSec on October 6, 2022, controlling its wind-up process without proper disclosures to the Estate, and distributing OtterSec's assets to himself. Ex. 1 ¶101.

- Robert transferring OtterSec assets he "purchased" to the South Dakota LLCs to continue OtterSec's business to the exclusion of the Estate. *Id.* ¶¶105-08.

Petitioner alleges that the dissolution of OtterSec was improper and invalid, and that the South Dakota LLCs are OtterSec's successors by receiving OtterSec's assets and running the same business. *Id.* ¶¶109-110. These asset transfers will be reflected in records Robert submitted to Agasi for OtterSec and the Successor Entities in order to receive tax advice and filing assistance.

On January 27, 2025, the Court in *Yao v. Chen, et al.* granted in part Robert's and the South Dakota LLCs' motion for judgment on the pleadings. *See* ECF #100-101. Although certain of the Estate's claims were dismissed, its core claims remain, and thus the factual issues are the same. The Estate's declaratory judgment claim to invalidate the dissolution and Robert's conflicted OtterSec asset purchase, fraud claim, and accounting claim remain in the case. *See* Ex. 1 ¶¶123-30 (declaratory judgment claim); ¶¶137-45 (fraud claims based on Jump acquihire); ¶¶160-64 (accounting claim). The decision also left open the issue of successor liability. *See* ECF #100 at 45; *see also* ECF #36 at 9-14 (discussing viability of successor liability).

**B. The Subpoena, Agasi's Objections, and Meet-and-Confer Discussions**

   1. <u>**Documents Sought**</u>

On November 6, 2024, Petitioner served the Subpoena on Agasi. Ex. 2. The Subpoena

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

contains ten requests, which can be divided into two categories:

**Request Nos. 1, 4-10:** The Subpoena requests Agasi's client files for Robert, OtterSec, and the Successor Entities from February 2022 to date. This includes contracts, agreements, engagement letters or other documentation evidencing the relationships (Request 1); tax records, including federal and state tax returns and schedules or attachments thereto (Requests 5-6); financial records such as general ledgers, profit and loss statements, payroll records, balance sheets, revenue or income statements, cash flow statements, statements of assets and liabilities, and debt schedules (Requests 7-9); and working papers, invoices or other documents concerning work performed or work to be performed (Request 10).

**Request Nos. 2-3:** The Subpoena requests, from February 2022 to date, documents and communications concerning (1) Robert, OtterSec, or the Successor Entities, and (2) Sam, Petitioner, the Estate, or David. These may not be in client files, but are related to the parties in the litigation.

### 2. <u>Agasi's Objections</u>

On November 20, 2024, Agasi served its objections to the Subpoena. Ex. 3. Despite receiving a federal subpoena, Agasi exclusively asserted objections under Arizona state law.

In general, Agasi objected that: (1) the Subpoena was "improper on the grounds that it was not issued 'from the superior court in the county where the production of documents or inspection is to be made,' in violation of Ariz. R. Civ. P. 45(c)(1)"; (2) it caused an undue burden "to the extent that it seeks documents or information that are available from parties to the action"; and (3) it was unduly burdensome as overbroad, duplicative, not limited in scope or time period, and seeks irrelevant, undiscoverable information. Ex. 3 at 2 (General Objections).

In response to each specific request, Agasi asserts the same page-long boilerplate objections that the information sought (1) is not discoverable; (2) is not relevant; (3) is vague and ambiguous; (4) seeks "financial, confidential, or other sensitive or private information,

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

4

4090370

that is protected or prohibited from disclosure under applicable law…including but not limited to, the right of privacy, as well as any other confidentiality rights possessed by third parties such as Agasi, OtterSec and DANS"; and (5) protected by the accountant-client privilege, "or any other applicable privilege," citing Ariz. Rev. Stat. Ann. §32-749. Ex. 3 at 3-17 (Specific Objections).

### 3. Meet and Confer Discussions

On December 10, 2024, counsel for Petitioner and Agasi met and conferred via phone call. Agasi stood on its objections, but the parties came to a narrower understanding of the Subpoena requests. On December 11, Petitioner's counsel memorialized that understanding and reiterated Petitioner's proposal that Agasi's counsel discuss with his client how client files are organized and stored to understand any potential burden. For example, Petitioner's counsel noted that if Agasi assigned client numbers or kept electronic files for Robert and his entities, that file would be responsive. Petitioner's counsel also noted that if those business records were centrally stored, the burden of searching and producing the information would be minimal.

As for documents and communications relating to the relevant parties, Petitioner's counsel reiterated a proposal for Agasi to search emails for the following search terms: "Robert Chen" and his email address, "OtterSec", "Otter Audits", "RC Security", "Digital Asset Network Security", "Sam Chen", and "Li Fen Yao". The search terms were meant to measure any burden by providing the volume of potentially responsive emails. Petitioner's counsel also requested that Agasi's counsel confirm whether the narrowed scope would resolve other objections.

Agasi's counsel responded the same day. Agasi's counsel agreed to ask his client about whether Agasi would provide: (1) client files for Robert, OtterSec, and the Successor Entities; (2) all emails with Robert; (3) any documents regarding Sam, Petitioner, David or the Estate. After receiving no other response, Petitioner's counsel followed up on December 18, 2024. Agasi's counsel did not respond.

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

5

4090370

In parallel, the Maryland Action parties were completing Court ordered meet-and-confer discussions to resolve outstanding discovery issues. Following those discussions (*see* ECF #95, 97-98, 106), Petitioner turned back to enforcing this Subpoena, since issues relevant here were not resolved.[3] Subsequently, the Court consolidated the cases and instructed the parties to submit a revised discovery schedule.

On April 1, 2025, Petitioner's counsel reached out again advising that, unless Agasi engaged in good faith, she would be seeking to enforce the Subpoena. In response, Agasi stood on its privilege objections, and produced a single, three-page email chain with David from 2023, and nothing else (including no mention of producing a privilege log for documents being withheld on that basis). Consequently, Petitioner filed this Motion.

ARGUMENT

Petitioner addresses Agasi's objections, aside from privilege issues (which state law governs under Federal Rule of Evidence 501), under federal law, rather than state law Agasi cited.

Initially, Agasi's objection that the Subpoena is invalid because the Subpoena was issued by a federal court in Maryland is completely meritless. *See* Ex. 3 at 2 (citing Ariz. R. Civ. P. 45(c)(1)). The Subpoena seeks documents in connection with an action pending in *federal* court and thus is governed by the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 1. Under Rule 45(a)(2), "[a] subpoena must issue from the court where the action is pending"—here the District of Maryland and from where the Subpoena was properly issued.

Agasi's remaining objections are also without merit, and Agasi should be compelled to respond to the Subpoena as the parties agreed in the meet-and-confer process.

## I.    THE DISCOVERY SOUGHT IS RELEVANT AND NOT UNDULY BURDENSOME

"[T]he test for 'relevance,' in the context of a Rule 45 subpoena to a non-party, is no

---

[3] Following the meet-and-confers, in a Joint Status Report, Robert took the position that "assertions of privilege by attorneys and accountants for OtterSec, [are] not ripe until they produce their privilege log." ECF #106 at 3.

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

4090370

different than the test under Rules 26 and 34." *Aquastar Pool Prods. v. Paramount Pool & Spa Sys.*, 2019 U.S. Dist. LEXIS 8273, *5 (D. Ariz. Jan. 16, 2019); *Evanston Ins. Co. v. Murphy*, 2020 U.S. Dist. LEXIS 218817, *4 (D. Ariz. Nov. 23, 2020); *see also* Fed. R. Civ. P. 26(b)(1). "Relevancy in civil litigation is a relatively low bar." *FTC v. Grand Canyon Educ. Inc.*, 2024 U.S. Dist. LEXIS 214564, *6 (D. Ariz. Nov. 22, 2024) (quotations and citation omitted). "[S]ome courts have suggested that relevance should be construed even more broadly than usual when, as here, the judge overseeing the litigation over the subpoena isn't handling the underlying case." *Aquastar*, 2019 U.S. Dist. LEXIS 8273 at *5-6.

While the test for relevance is the same, in the context of nonparty discovery, the requesting party must make a "stronger-than-usual" showing of relevance "to demonstrate that its need for discovery outweighs the nonparty's interest in nondisclosure." *Briggs v. Cty. of Maricopa*, 2021 U.S. Dist. LEXIS 61386, *8-9 (D. Ariz. Mar. 30, 2021) (quotation marks and citation omitted). Petitioner can meet this burden, as the discovery is directly relevant and not unduly burdensome.

## A.    The Discovery Sought Is Relevant

The Subpoena requests two categories of information: (1) the financial records, tax returns and documents, and working papers that are in the client files for Robert, OtterSec, and the Successor Entities; and (2) email communications that mention Robert, OtterSec, the Successor Entities, Petitioner, the Estate, Sam, or David. These categories are directly relevant to the Estate's claims, which as described above, generally concern the improper dissolution of OtterSec, the purchase of its assets, and the profits and income of OtterSec and the Successor Entities.

First, the client files, including the financial records, are relevant to the Estate's claims that Robert invalidly purchased OtterSec's assets, and then transferred them to the South Dakota LLCs as successors. Ex. 1 ¶¶4-6, 102-05, 123-30. In discovery, the Estate learned of another entity Robert created, DANS, and the same records are relevant to confirm whether Robert improperly transferred OtterSec assets to DANS. The documents are also relevant to

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

7

4090370

the accounting claim. The Court in the Maryland Action specifically noted Petitioner is entitled to "receive[] the equivalent of the requested accounting by the close of discovery." ECF #100 at 44-45.

Second, communications about the various parties and entities in the litigation are relevant because they likely discuss OtterSec's dissolution, formation of the Successor Entities, and strategies Robert considered in dissolving OtterSec and completing the conflicted asset purchase. In discovery, Petitioner has already received communications involving Agasi and Robert, OtterSec, and the South Dakota LLCs, some of which discuss Sam and OtterSec's dissolution.

Finally, the time period of February 2022 to present is relevant and not overbroad because OtterSec was formed in February 2022 and the location and value of its assets are relevant today. The Estate's successor liability theory also hinges on whether Robert transferred OtterSec's assets to the Successor Entities and whether those assets remain with those entities. Additionally, the Estate's accounting claim makes the timeframe appropriate. The Estate is entitled to at least 40% of the assets—50% if proven that Robert defrauded Sam into transferring his 10% interest to Robert—from Robert or the Successor Entities, depending on where the requested financial information shows those assets are located.

At bottom, the requested discovery is relevant to Robert's treatment of OtterSec's assets, which will demonstrate successor liability and reveal that the conflicted asset purchase for $210,000 was below fair market value for a company with annualized revenue of $5 million. As discussed further below, Agasi has no comparable interest in nondisclosure.

**B.    Agasi Has Failed To Show That Compliance Is Unduly Burdensome**

While Agasi has objected to the Subpoena on grounds that it poses an undue burden, Agasi has not articulated it, and refused to provide any information regarding the volume of responsive documents (or efforts it must undertake to search them). It is not unduly burdensome for Agasi to provide this kind of information, which "lies exclusively within [its] knowledge." *Advanced Reimbursement Solutions LLC v. Aetna Life Ins. Co.*, 2022 U.S.

4090370

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251–3693

Dist. LEXIS 1161, *6 (D. Ariz. Jan. 3, 2022); 9 Moore's Federal Practice §45.32 (Bender 3d ed.) ("Boilerplate objections do not suffice to establish undue burden."). Indeed, "[a]ssessing proportionality requires the input of both parties." *Mi Familia Vota v. Hobbs*, 343 F.R.D. 71, 94 (D. Ariz. 2022). This alone warrants rejection of the objection.

In any event, the Subpoena is not unduly burdensome. As initially served, the Subpoena contained a reasonable time limit and targeted requests for documents that are typically part of an accountant's client files or found in emails that can be easily searched. Any argument that the Subpoena might have posed an undue burden has been negated because, during the meet-and-confer process, Petitioner agreed to narrow the requests through proposed search terms for emails and a clarification of the meaning of client files— the financial records that Agasi stores for its clients in the manner in which they are stored in the ordinary course. These limitations minimize any potential burden. *See Advanced Reimbursement*, 2022 U.S. Dist. LEXIS 1161 at *8, *8 n.1 (accepting issuing party's limits on subpoena, finding this is "the type of objection that should have been resolved through a good-faith consultation"). The narrowed requests from the meet-and-confer also moot objections of overbreadth, vagueness, and ambiguity.

**C.  Under the Circumstances, Petitioner Should Be Able To Obtain The Requested Discovery From Agasi And Not Be Limited To Obtaining It From Robert**

Agasi's objection that it is unduly burdensome to seek non-party discovery, before seeking overlapping discovery from a party, is inapplicable. *See id.* at *8-9 (rejecting undue burden argument that "documents sought in subpoena should have been sought from parties"). Although "[i]n general, there is a preference for parties to obtain discovery from one another before burdening non-parties with discovery requests," this is not a strict requirement. *Mi Familia*, 343 F.R.D. at 95-96 (quotations and citation omitted); *Fox v. State*, 2022 U.S. Dist. LEXIS 227883, *28 (D. Ariz. Dec. 19, 2022) (whether information requested by subpoena is available from a party is part of the undue burden analysis). The issuing party must show that it attempted to obtain any overlapping documents through party discovery. *See Mi Familia*, 343 F.R.D. at 95; *cf. Williams & Cochrane LLP v. REDW LLC*, 2020 U.S.

9

Dist. LEXIS 138296, *15 (D. Ariz. Aug. 3, 2020) (issuing party must show its need for the discovery from the subpoenaed party). Courts also consider whether it can be more easily and inexpensively obtained. *Mi Familia*, 343 F.R.D. at 95-96.

Here, Petitioner attempted to obtain documents requested in the Subpoena in party discovery. *See, e.g.*, Ex. 4, Petitioner's First Set Of Requests For The Production Of Documents And Electronically Stored Information Nos. 3-4 (documents "to show all entities or businesses in which Defendants have any ownership or financial interest"); No. 8 ("communications with…vendors…independent contractors, consultants, personnel or other third parties" related to the dissolution and winding up of OtterSec); No. 15 ("Documents and communications concerning general ledgers, state and federal tax returns, financial statements, profit and loss statements, loans, expenses, payroll records, balance sheets, revenue or income, cash flow, assets, liabilities, and debt schedules for Defendants and OtterSec."); Nos. 16-17 (documents about Robert and the Successor Entities' financial accounts); No. 20 ("Documents and communications concerning any forms W-2, 1099 or K-1 issued or required to be issued by, on behalf of, or to Defendants, OtterSec, Sam Chen, Petitioner, the Estate or David Chen."); No. 21 ("Documents and communications concerning the ownership interests, financial interests, or rights of Robert Chen, Sam Chen, Petitioner, the Estate or David Chen in or to RC Security, Otter Audits and OtterSec."). To date, Petitioner has not received these materials for the relevant time period. Moreover, many of these materials—e.g., the client file, working papers, internal communications—are likely to be in Agasi's sole possession, so the Subpoena is an appropriate avenue for obtaining them.

## II.     NO ACCOUNTANT-CLIENT PRIVILEGE APPLIES

Agasi has asserted the accountant-client privilege in reliance on Arizona law. But this objection must be rejected because Arizona law does not govern the question of whether there is an applicable privilege, and once the laws of the relevant jurisdictions are considered, it is clear that the materials are not protected. Moreover, any such privilege has been waived.

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

4090370

Since the only remaining claims in the Maryland Action are state law claims, state privilege law applies. *See* Fed. R. Evid. 501 ("But in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision."). Federal courts adjudicating a motion to compel compliance with a subpoena apply the forum state's choice of law rules—that is, the forum of the Rule 45 subpoena compliance proceeding. *See Bogard Constr., Inc. v. Oil Price Info. Serv., LLC*, 604 F. Supp. 3d 895, 900-901 (N.D. Cal. 2022); *Ziegler v. Polaris Indus. Inc.*, 2022 U.S. Dist. LEXIS 207006, *9 (W.D.N.C. Nov. 15, 2022); *City of Almaty v. Ablyazov*, 2018 U.S. Dist. LEXIS 242385, *3-4 (S.D.N.Y. July 23, 2018); *Apex Mortg. Corp. v. Great Northern Ins. Co.*, 2018 U.S. Dist. LEXIS 2811, *5-6 (N.D. Ill. Jan. 8, 2018); *see also* 23A Wright & Miller, Federal Practice and Procedure, §5435 (1st ed. June 2024 Update) (applying state choice of law rules of forum is the "all but unanimously endorsed" method which follows *Klaxon* and *Erie* doctrines that "requires federal courts to adhere to state choice of law rules in cases where state law supplies the rule of decision" and is supported by "the intent of Congress to leave the law of privileges unchanged" and "to preserve the *Erie* doctrine").[4] Thus, Arizona law, and its choice of law rules, apply to determine the applicable privilege law.

Arizona applies the Restatement (Second) of Conflicts (1971) (the "Restatement") to determine conflict of law issues. *Bryant v. Silverman*, 703 P.2d 1190, 1191 (Ariz. 1985) (en banc); *see also Lange v. Penn Mut. Life Ins. Co.*, 843 F.2d 1175, 1178 (9th Cir. 1988); *Andrich v. Kostas*, 2020 U.S. Dist. LEXIS 11150, *25 (D. Ariz. Jan. 23, 2020). The first step is determining whether there is a conflict between the different jurisdictions whose laws

---

[4] *See also Stromberg v. Qualcomm Inc.,* 14 F.4th 1059, 1067 (9th Cir. 2021) ("When state claims are brought, federal courts apply the choice of law rules of the forum state."); *but see Home Indem. Co. v. Lane Powell Moss & Miller*, 43 F.3d 1322, 1328 (9th Cir. 1995) (applying state privilege law of the state that supplied the rule of decision for the claims). *Home Indemnity* does not explain its position, which is based on a reading of Federal Rule of Evidence 501 that is not necessarily supported by the text and history of the rule. *See Bogard*, 604 F. Supp. 3d at 900 ("If [FRE 501] directed that the state law supplying the rule of decision governs privilege law, then it would have read 'the state law regarding a claim or defense which supplies the rule of decision governs privilege.' It did not; instead, it provides that *state law*, but not any particular state law….") (emphasis in original).

11

4090370

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

might apply. *See United States Aviation Underwriters, Inc. v. Eurocopter, S.A.S.*, 2006 U.S. Dist. LEXIS 46451, *11 n.6 (D. Ariz. July 7, 2006) (citing *Lucero v. Valdez*, 884 P.2d 199, 207 (Ariz. Ct. App. 1994)).

Here, there is a conflict. While Arizona may recognize an accountant-client privilege, *see* Ariz. Rev. Stat. §32-749, the other jurisdictions which have an interest (the states of incorporation of the corporate entities and the state where Robert resides) do not, *see* Wyo. Stat. §1-12-101 (not listing accountant-client privilege);[5] S.D. Stat. §§19-2-1 to 19-2-20, 19-19-501 to 19-19-516 (not listing privilege);[6] *Skaninaviska Enskilda Banken AB (Publ), Singapore Branch v. Asia Pacific Breweries (Singapore) Pte Ltd* [2007] SGCA 9 ¶¶ 43-46, 98-100 (Singapore Court of Appeal supported position that legal advice privilege may extend to communications between a client and a third party (such as an accountant) only if the main purpose of the communication is to obtain legal advice);[7] R.C.W. §5.60.060 (not listing accountant-client privilege).[8]

Since there is a conflict, the next question is determining which state "has the most significant relationship with the communication." Under section 139(1) of the Restatement:

> Evidence that is not privileged under the local law of the state which has the most significant relationship with the communication will be admitted, even though it would be privileged under the local law of the forum, unless the

---

[5] *See also Fisher v. Mulligan*, 2020 U.S. Dist. LEXIS 257249, *10 (D. Wyo. July 31, 2020) (in judicial dissolution action, company valuations prepared in person's "capacity as an accountant for the [company]" are not privileged").

[6] *But see* S.D. Stat. §47-13B-18 ("Nothing in this chapter shall be deemed to modify the accountant-client privilege established by the Legislature and any comparable common privilege."). Petitioner has not been able to locate any such privilege established by the South Dakota Legislature.

[7] It does not appear that there is Singaporean law directly on point. To the extent UK law is relied on in *Skaninaviska*, it does not recognize the accountant-client privilege. *See R (Prudential plc and another) v Special Comm'r of Income Tax and another* [2013] UKSC 1 ¶¶ 24, 48-53, 81, 93 (tax advice from accountant is not covered by legal advice privilege); *see also Weiss v. Nat'l Westminster Bank, PLC*, 242 F.R.D. 33, 40 (E.D.N.Y. 2007) (banker-client confidentiality in English law excepted "[w]here disclosure is under compulsion by law").

[8] *Cf.* R.C.W 18.04.405(1) (accountant-client information not subject to disclosure unless "required by law [or] legal process"); W.A.C § 4-30-050(2)(a) (accountant-client confidentiality does not "[a]ffect in any way the obligation of those persons to comply with…a lawfully issued subpoena"); *see also In re Marriage of Irwin*, 822 P.2d 797, 805 (Wash. App. 1992).

admission of such evidence would be contrary to the strong public policy of the forum.

As one comment to this section provides: "[t]here can be little reason why the forum should exclude evidence that is not privileged under the local law of the state which has the most significant relationship with the communication…. Admitting such evidence cannot defeat the expectations of the parties since, if they relied on any law at all, they would have relied on the local law of the state of most significant relationship." *Id.* §139 cmt. c. The jurisdiction with the most significant relationship "has a substantial interest in determining what evidence is privileged and [the forum's] interest is served because admission of the evidence will assist the Court in arriving at the truth of the matter." *Certain Underwriters at Lloyd's v. Morrow*, 2018 U.S. Dist. LEXIS 187194, *7-8 (W.D. Ky. Nov. 1, 2018) (citing Restatement §139 cmt. c).

Here, where the client in the accountant-client relationship resides is the state with the most significant relationship to the communications. "Since privileges primarily benefit their holders—such as a client or patient—identifying the holder should be an important indication of which state has the most significant relationship to the communication. The privilege holder's affiliation with competing states is of paramount importance and should be a primary factor in determining which state has the most significant relationship to a communication." *Lion Elec. Co. v. Nikola Corp.*, 2024 U.S. Dist. LEXIS 165030, *8 (D. Ariz. Sept. 13, 2024); *see also In re: Bard IVC Filters Prods. Liab. Litig.*, 2016 U.S. Dist. LEXIS 97043, *203 (D. Ariz. July 25, 2016) (applying Arizona law under the Restatement approach because "although lawyers and paralegals for Bard may be based in New Jersey, it appears their client for purposes of these communications, as well as the subject of their communications, is primarily…in Arizona"). Where the "accountant's files are located…is of marginal relevance." *Kuhn & Kogan Chtd. v. Jeffrey C. Mensh & Assocs.*, 77 F. Supp. 2d 52, 54-55 (D.D.C. 1999) ("the jurisdiction in which the client resides has a strong interest in having its law govern the accountant-client relationship"); *see also Renfield Corp. v. E. Remy Martin & Co., S.A.*, 98 F.R.D. 442, 445 (D. Del. 1982) (applying Restatement §139, looking

13

4090370

to location of the clients to determine state with most significant relationship).[9] Under the applicable law for each relevant jurisdiction—Washington state (Robert), Wyoming (OtterSec), and South Dakota and Singapore (Successor Entities)—the discovery requested is not privileged.

Additionally, there is no evidence that Arizona has a "strong public policy" that would warrant applying Arizona's privilege law here. *See* Restatement §139(1) (law of jurisdiction with most significant relationship applies "unless…contrary to the strong public policy of the forum"). Arizona courts have found that the statutory accountant-client privilege should be strictly construed and have applied that principle to limit its application. *See State v. O'Brien*, 601 P.2d 341, 348 (Ariz. Ct. App. 1979) ("The [accountant-client privilege] statute and privilege which it accords must be strictly construed, since no such privilege exists in the common law…and the statute tends to prevent full disclosure of facts.") (citation omitted); *Brown v. Superior Court*, 670 P.2d 725, 736 (Ariz. 1983) (further limiting statute's application).

Finally, Robert produced financial records, tax documents, and email communications with Agasi in the Maryland Action, without raising Arizona's accountant-client privilege. To the extent that he or the Successor Entities even believed Arizona accountant-client privilege applied, they have waived it.[10] Further, Agasi has waived privilege by failing to produce a privilege log for about four months after the parties initially met and conferred. *See Burlington Northern & Santa Fe Ry. v. United States Dist. Court*, 408 F.3d 1142, 1149 (9th Cir. 2005) (case-by-case analysis factors). Here, finding waiver is appropriate for this failure because Agasi asserts boilerplate objections, and the withheld documents comprise virtually all of the documents at issue (all but three pages) such that it is implausible any individualized

---

[9] Restatement comment e provides: "The state which has the most significant relationship with a communication will usually be the state where the communication took place…." But this approach "is problematic in a day of electronic communications" and use of the word "usually" allows for other, more common-sense approaches. *See Bard*, 2016 U.S. Dist. LEXIS 97043 at *200, *200 n.2.

[10] DANS is also one of Robert's companies, but it has not produced any documents in the Maryland Action.

14

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

4090370

privilege analysis has been done. *Mi Familia Vota v. Fontes*, 344 F.R.D. 496, 520-23 (D. Ariz. 2023) (applying *Burlington* factors).[11] Thus, Agasi's privilege objections fail.

### III. NO PRIVACY RIGHTS PREVENT PRODUCTION OF RESPONSIVE DOCUMENTS

Agasi makes a vague objection citing unspecified "privacy rights." Not only is there no right to privacy in the requested financial records and communications, any such rights have been waived. Further, the existing protective order in the Maryland Action moots this objection.

Initially, Agasi's objection does not "describe the nature of the withheld documents, communications…in a manner that, without revealing information itself privileged or protected" for the claim to be assessed. Fed. R. Civ. P. 45(e)(2)(A)(ii); *see also Williams & Cochrane LLP*, 2020 U.S. Dist. LEXIS 138296 at *14 ("bland assertion that [Arizona privilege law] protects every single subpoenaed document would be difficult for the Court, let alone [the opposing party], to evaluate"). Thus, it should be disregarded as overbroad.

Even assuming Arizona law applies, it does not provide privacy rights for financial records. *See Davenport v. SP Jedi, Inc.*, 2019 U.S. Dist. LEXIS 229314, *4-5 (D. Ariz. Apr. 19, 2019) (citing cases "determin[ing] that the parties did not have a privilege in their financial records under [Arizona] state or federal law"); *R. Prasad Indus. v. Flat Irons Envtl. Solutions Corp.*, 2014 U.S. Dist. LEXIS 84193, *18 (D. Ariz. June 19, 2014) (noting inability to find any Arizona statutes or cases "that have recognized any privilege or other special protection from discovery" private financial information). Moreover, any privacy rights are outweighed by Petitioner's need for the discovery and were waived when Robert and the South Dakota LLCs produced similar documents. *See Gann v. GM LLC*, 2022 U.S. Dist. LEXIS 148563, *7 (D. Ariz. Aug. 18, 2022) ("court must weigh claim to privacy against the need for disclosure") (citing *Fed. Open Market Comm. of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 362 (1979)). Further, Agasi has not cited any privacy rights that it has in its clients'

---

[11] If waiver is not found, Petitioner requests that Agasi be ordered to produce a privilege log.

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

1   records or its own business records.

2      In any event, the parties in the Maryland Action have entered into a protective order

3   which extends to all parties and third parties. This should moot any objections on privacy

4   rights grounds. ECF #54 §1; *see also Ocean Garden Prods. v. Blessings Inc.*, 2020 U.S. Dist.

5   LEXIS 152906, *10 (D. Ariz. Aug. 24, 2024) (when objections to subpoenas are "on the

6   grounds that they seek personal, confidential information," "any privacy concerns are

7   adequately addressed by the Court's protective order"); *Briggs*, 2021 U.S. Dist. LEXIS

8   61386 at *15 n.5 (a party "cannot object simply because the documents are of a private and

9   confidential nature, as the documents may still be properly disclosed pursuant to the

10  protective order entered in this case").

11                              **CONCLUSION**

12      For the foregoing reasons, Petitioner respectfully requests the motion be granted.

13      DATED this 4th day of April, 2025.

                                        SACKS TIERNEY P.A.
14

15

16                                      By: _/s/ Evan F. Hiller_____

17                                          Evan F. Hiller
                                            *Attorneys for Plaintiff*

18  COPY of the foregoing sent via
    electronic mail this 4th day of April,
19  2025, to:

20  Steven S. Kaufhold, Esq.
    Jonathan B. Gaskin, Esq.
21  Liana Mayilyan, Esq.
    KAUFHOLD GASKIN LLP
22  485 Pacific Avenue
    San Francisco, CA 94133
23  SKaufhold@KaufholdGaskin.com
    JGaskin@KaufholdGaskin.com
24  LMayilyan@KaufholdGaskin.com
    Attorneys for Non-Party Agasi Tax
25  & Financial, PLLC

26  By: _/s/ Debra D. Davenport_____

27

28                              16

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

4090370

# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

LI FEN YAO, as Administrator of the Estate of
Sam Mingsan Chen,

     Petitioner,

   v.

AGASI TAX & FINANCIAL, PLLC,

     Respondent.

Case No.

## DECLARATION OF ALEXANDER G. MALYSHEV
## IN SUPPORT OF PETITIONER'S MOTION TO COMPEL COMPLIANCE WITH
## SUBPOENA TO PRODUCE DOCUMENTS TO NON-PARTY AGASI TAX &
## FINANCIAL, PLLC PURUSANT TO FEDERAL RULE OF CIVIL PROCEDURE 45

ALEXANDER G. MALYSHEV, hereby declares under penalty of perjury, pursuant to 28

U.S.C. § 1746, as follows:

1.     I am a partner with the law firm of Carter Ledyard & Milburn LLP, counsel for

Petitioner Li Fen Yao, as administrator of the estate of Sam Chen ("Sam"), who is Plaintiff in the

lead case, *Yao v. Chen, et al.* No. 8:23-00889-TDC (D. Md. 2023) (the "Maryland Action"), of

two consolidated actions pending in the District of Maryland ("Petitioner" or the "Estate").

2.     I submit this declaration in support of Petitioner's Motion to Compel Compliance

With Third-Party Subpoena served on Agasi Tax & Financial, PLLC ("Agasi").

3.     Petitioner served the Subpoena to Produce Documents, Information, or Objects or

to Permit Inspection of Premises in a Civil Action dated November 6, 2024 (the "Subpoena") on

Agasi. Petitioner received Agasi's objections on November 20, 2024. Counsel for the parties

participated in a meet-and-confer phone call on December 10, 2024, and have exchanged emails following up on that call. Petitioner has participated in the meet-and-confer process in good faith to address any objections Agasi asserted, but files this motion to compel Agasi's compliance with the Subpoena because the parties remain at an impasse on the majority of the discovery requested in the Subpoena.

4.      Attached as **Exhibit 1** is a true and correct copy of the complaint filed in United States District Court for the District of Maryland on March 31, 2023 in the Maryland Action, *Yao v. Chen, et al.*, No. 8:23-cv-00889-TDC (D. Md. 2023), ECF #1.

5.      Attached as **Exhibit 2** is a true and correct copy of the Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action dated November 6, 2024 served on Agasi by Petitioner (the "Subpoena").

6.      Attached as **Exhibit 3** is a true and correct copy of Non-Party Agasi Tax & Financial, PLLC's  Objections To Petitioners' Subpoena To Produce Documents, Information, Or Objects Or To Permit Inspection Of Premispes In A Civil Action, served on Petitioner on November 20, 2024.

7.      Attached as **Exhibit 4** is a true and correct copy of Petitioner's First Set Of Requests For The Production Of Documents And Electronically Stored Information, dated April 12, 2024.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on:  April 4, 2025

Alexander G. Malyshev

# EXHIBIT 2

# EXHIBIT 2

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
District of Maryland

| | |
|---|---|
| Li Fen Yao, as Admin. of Estate of Sam M. Chen | ) |
| *Plaintiff* | ) |
| v. | )     Civil Action No.   8:23-cv-889-TDC |
| Robert Chen, Otter Audits LLC, and RC Security LLC | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:        Agasi Tax & Financial, PLLC, Attention: David Agasi
            16420 N. 92nd St., Suite 115, Scottsdale, AZ 85260

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See attached Schedule A

| Place: Sacks Tierney, 4250 N. Drinkwater Blvd., Fourth Floor Scottsdale, AZ 85251.  Attn: Steven Beeghley. | Date and Time: 11/27/2024 12:00 pm |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:        11/06/2024

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | /s/ Stephen M. Plotnick |
| | | /s/ Daniel M. Kennedy |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Li Fen Yao, as Admin. of Estate of Sam M. Chen _____ , who issues or requests this subpoena, are:

Stephen Plotnick (pro hac vice), Carter Ledyard & Milburn LLP, 28 Liberty Street, 41st Fl., NY, NY 10005; 212-238-8772; plotnick@clm.com.
Daniel M. Kennedy III, Barkley Kennedy, 51 Monroe Street, Ste 1407, Rockville, MD 20850, 301-251-6600, dkennedy@barkenlaw.com

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   23-cv-889-TDC

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❒  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## SCHEDULE A

### *To the November 6, 2024, Subpoena Duces Tecum to Agasi Tax & Financials PLLC*

A.      The instructions and definitions set forth in the Uniform Instructions and Definitions for Use in Discovery Requests set forth in Appendix D of the Local Rules of the United States District Court for the District of Maryland apply, as modified for applicability to this Subpoena and set forth below:

INSTRUCTIONS:

1. Pursuant to Rule 34(b)(2)(B), if you object to any of the Requests, the grounds for each objection must be stated with specificity. Also pursuant to that Rule, if you intended to produce copies of documents or of ESI instead of permitting inspection, you must so state.

2. If, in responding to the Requests, the responding party encounters any ambiguities when construing a request or definition, the response shall set forth the matter deemed ambiguous and the construction used in responding.

3. Pursuant to Rule 34(b)(2)(C), an objection must state whether any responsive materials are being withheld on the basis of that objection.

4. Whenever in this Request you are asked to identify or produce a document which is deemed by you to be properly withheld from production for inspection or copying:

A. If you are withholding the document under claim of privilege (including, but not limited to, the work product doctrine), please provide the information set forth in Fed. R. Civ. P. 26(b)(5) and Discovery Guideline 10(d)(ii)(b). For electronically stored information, a privilege log (in searchable and sortable form, such as a spreadsheet, matrix, or table) generated by litigation review software, containing metadata fields that generally correspond to the above paragraph is permissible, provided that it also discloses whether transmitting, attached or subsidiary ("parent-child") documents exist and whether those documents have been produced or withheld.

B. If you are withholding the document for any reason other than an objection that it is beyond the scope of discovery, identify as to each document and, in addition to the information requested in paragraph 4.A, above, please state the reason for withholding the document. If you are withholding production on the basis that ESI is not reasonably accessible because of undue burden or cost, provide the information required by Discovery Guideline 10(e).

5. When a document contains both privileged and non-privileged material, the non-privileged material must be disclosed to the fullest extent possible without thereby

disclosing the privileged material. If a privilege is asserted with regard to part of the material contained in a document, the party claiming the privilege must clearly indicate the portions as to which the privilege is claimed. When a document has been redacted or altered in any fashion, identify as to each document the reason for the redaction or alteration, the date of the redaction or alteration, and the person performing the redaction or alteration. Any redaction must be clearly visible on the redacted document.

6. It is intended that the Requests will not solicit any material protected either by the attorney/client privilege or by the work product doctrine which was created by, or developed by, counsel for the responding party after the date on which this litigation was commenced. If any Request is susceptible of a construction which calls for the production of such material, that material need not be provided and no privilege log pursuant to Fed. R. Civ. P. 26(b)(5) or Discovery Guideline 9(a) will be required as to such material.

DEFINITIONS

Notwithstanding any definition set forth below, each word, term, or phrase used in the Requests is intended to have the broadest meaning permitted under the Federal Rules of Civil Procedure. As used in the Requests, the following terms are to be interpreted in accordance with these definitions:

1. Communication: The term "communication" means the transmittal of information by any means.

2. Concerning: The term "concerning" means relating to, referring to, describing, evidencing, or constituting.

3. Document: The terms "document" and "documents" are defined to be synonymous in meaning and equal in scope to the usage of the term "items" in Fed. R. Civ. P. 34(a)(1) and include(s), but is not limited to electronically stored information. The terms "writings," "recordings," and "photographs" are defined to be synonymous in meaning and equal in scope to the usage of those terms in Fed. R. Evid. 1001. A draft or non-identical copy is a separate document within the meaning of the term "document."

4. Form or Forms: If documents are produced as electronically stored information, they shall be produced via a file transfer protocol site, on a portable hard or flash drive or other reasonably accessible media format. Documents maintained in hardcopy shall be produced in TIFF image format with corresponding OCR text, associated data identifying the beginning and ending bates numbers and, to the extent applicable, information associating document families or attachment ranges. Electronically stored documents should be produced in accordance with the Hybrid Production Protocol set forth in Appendix 2.1 of the Principles for the Discovery of Electronically Stored Information in Civil Cases in the United States District Court for the District of Maryland.

5. Occurrence/Transaction: The terms "occurrence" and "transaction" mean the events described in the Complaint and other pleadings, as the word "pleadings" is defined in Fed. R. Civ. P. 7(a).

6. <u>Parties</u>: The terms "plaintiff" and "defendant" (including, without limitation, third-party plaintiff, third-party defendant, counter claimant, cross-claimant, counter-defendant, and cross-defendant), as well as a party's full or abbreviated name or a pronoun referring to a party, mean that party and, where applicable, its officers, directors, and employees.

7. <u>Person</u>: The term "person" is defined as any natural person or any business, legal or governmental entity, or association.

8. <u>You/Your</u>: The terms "you" or "your" include the person(s) to whom the Subpoena and its Requests are addressed, and all of that person's agents, representatives, and attorneys.

9. The present tense includes the past and future tenses. The singular includes the plural, and the plural includes the singular. "All" means "any and all;" "any" means "any and all." "Including" means "including but not limited to." "And" and "or" encompass both "and" and "or." Words in the masculine, feminine, or neuter form shall include each of the other genders.

10. If the requested documents are maintained in a file, the file folder is included in the request for production of those documents.

B.    <u>Action.</u> The "Action" means the above-captioned litigation, including all pleadings and proceedings filed or had therein.

C.    <u>Agasi</u>.  "Agasi" means Agasi Tax & Financials, PLLC, and, where applicable, its officers, directors, members, employees, partners, corporate parents, subsidiaries, affiliates, or representatives.

D.    <u>Complaint.</u>  The "Complaint" means the Complaint in the Action, dated and filed in the United States District Court for the District of Maryland on March 31, 2023, together with any amendments thereto.  The Complaint is attached hereto as Exhibit 1.

E.    <u>DANS.</u>  "DANS" means Digital Asset Network Security PTE Ltd. and, where applicable, its officers, directors, members, employees, partners, corporate parents, subsidiaries, affiliates or representatives.

F.    <u>David Chen.</u> "David Chen" means David Chen, and includes any of his representatives.

G.      <u>Defendants.</u>  "Defendants" means, collectively and separately, Robert Chen, Otter Audits and RC Security and, where applicable, their officers, directors, members, employees, partners, corporate parents, subsidiaries, affiliates or representatives.

H.      <u>Estate.</u>  The term "Estate" means the Estate of Sam Mingsan Chen, and includes any of its representatives.

I.      <u>Otter Audits.</u>  "Otter Audits" means Defendant Otter Audits LLC and, where applicable, its officers, directors, members, employees, partners, corporate parents, subsidiaries, affiliates or representatives.

J.      <u>OtterSec.</u> "OtterSec" means OtterSec LLC and, where applicable, its officers, directors, members, employees, partners, corporate parents, subsidiaries, affiliates or representatives.

K.      <u>Plaintiff.</u>  "Plaintiff" means Li Fen Yao, as Administrator of the Estate of Sam Mingsan Chen, and includes any of her representatives.

L.      <u>RC Security.</u> "RC Security" means Defendant RC Security LLC and, where applicable, its officers, directors, members, employees, partners, corporate parents, subsidiaries, affiliates or representatives.

M.      <u>Relevant Period.</u> The term "Relevant Period" means February 1, 2022 through the present.

N.      <u>Representative.</u> The terms "representative" or "representatives" mean agents or any persons acting or purporting to act on behalf of, or in concert with, any other person.

O.      <u>Robert Chen.</u>  "Robert Chen" means Defendant Robert Chen, and includes any of his representatives.

P.     <u>Sam Chen.</u>   "Sam Chen" means Sam Mingsan Chen, and includes any of his representatives.

**REQUESTS**

1.     All contracts, agreements, engagement letters or other documentation evidencing the relationship between Agasi and Robert Chen, OtterSec, Otter Audits, RC Security or DANS for calendar years 2022 to date.

2.     All documents and communications concerning Robert Chen, OtterSec, Otter Audits, RC Security or DANS for the Relevant Period.

3.     All documents and communications concerning Sam Chen, Plaintiff, the Estate or David Chen for the Relevant Period.

4.     The entire client files for Robert Chen, OtterSec, Otter Audits, RC Security and DANS for the Relevant Period.

5.     All tax records, including federal and state tax returns and all schedules or attachments thereto, for Robert Chen, OtterSec, Otter Audits, RC Security and DANS for calendar years 2022 to date.

6.     All forms W-2, 1099, and K-1 issued by, on behalf of, or to Robert Chen, OtterSec, Otter Audits, RC Security or DANS for calendar years 2022 to date.

7.     All spreadsheets and financial statements or records, including general ledgers, profit and loss statements, payroll records, balance sheets, revenue or income statements, cash flow statements, statements of assets and liabilities, and debt schedules, concerning Robert Chen, OtterSec, Otter Audits, RC Security or DANS for calendar years 2022 to date.

8.     All documents provided to Agasi by or on behalf of Robert Chen, OtterSec, Otter Audits, RC Security or DANS for the Relevant Period.

11359199.3

9.     All documents provided by Agasi to Robert Chen, OtterSec, Otter Audits, RC Security, DANS or any of their representatives for the Relevant Period.

10.     All working papers, invoices or other documents concerning or supporting work performed or work to be performed for Robert Chen, OtterSec, Otter Audits, RC Security or DANS for the Relevant Period.

# EXHIBIT 1

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND, SOUTHERN DIVISION

LI FEN YAO, as ADMINISTRATOR OF THE
ESTATE OF SAM MINGSAN CHEN, deceased,
13717 Travilah Road
Rockville, MD 20850

                  Plaintiff,

                  -v-

ROBERT CHEN,
4710 142 Pl. SE
Bellevue, WA 98006;

OTTER AUDITS LLC,
519 West 22nd Street
Suite 100
Sioux Falls, SD 57105; and

RC SECURITY LLC,
519 West 22nd Street
Suite 100
Sioux Falls, SD 57105

                  Defendants.

Civil Action No. _____

**JURY TRIAL DEMANDED**

### COMPLAINT

    Plaintiff Li Fen Yao ("Plaintiff"), as Administrator of the Estate of Sam Mingsan Chen

(the "Estate"), by and through her undersigned attorneys, hereby brings this action against

Defendants Robert Chen ("Robert" or "Robert Chen"), Otter Audits LLC ("Otter Audits"), and

RC Security LLC ("RC Security" and, together with Robert Chen and Otter Audits,

"Defendants") and, in support thereof, respectfully alleges on knowledge as to herself and her

own actions and on information and belief as to all other matters, as follows:

### NATURE OF THE ACTION

    1.    This action arises out of Defendants' brazen plot to steal the Estate's interest in

a limited liability company known as OtterSec LLC ("OtterSec").

2.      OtterSec was formed in February 2022 under Wyoming law, and its only two members were Sam Chen ("Sam" or "Sam Chen") and Defendant Robert Chen.[1] After Sam Chen tragically passed away in a car accident on July 13, 2022, Robert Chen seized the opportunity to follow through with a duplicitous scheme, which he threatened months earlier, to make off with the entire company for himself.

3.      In particular, while Sam Chen's family was still grieving his loss, Robert Chen (a) secretly formed two new companies in South Dakota, Defendants Otter Audits and RC Security, (b) proceeded to exploit his control and authority over OtterSec to unilaterally dissolve OtterSec, and then (c) misappropriated OtterSec's assets, employees, clients, opportunities, and other tangible and intangible property for his new companies, Otter Audits and RC Security, and to the exclusion of the Estate.

4.      By all appearances, Otter Audits and RC Security are engaged in the exact same business as OtterSec, utilizing OtterSec's employees, assets, and other resources, providing services to OtterSec's clients, and capitalizing on OtterSec's business opportunities and good-will. Defendants are even making use of OtterSec's name, logo, website, and social media presence to portray themselves outwardly as though they actually are OtterSec.

5.      All of Robert Chen's maneuvering and chicanery is a classic example of a de facto merger, and Otter Audits and RC Security are the essence of a mere continuation of OtterSec. The dissolution of OtterSec and formation of Otter Audits and RC Security were fraudulent transactions arranged and effectuated by Robert Chen, in violation of his fiduciary duties, in order to effectuate the master plan he formulated to, in his own words, "dissolve the company and remake it" without Sam Chen or the Estate.

6.      Accordingly, by this action, Plaintiff seeks to recover the Estate's rightful interest in OtterSec's successors, Otter Audits and RC Security, together with an award of

---

[1] Although they share the same last name, Sam Chen and Robert Chen are not related.

damages, profits, costs, and other relief available at law and in equity as a direct and proximate result of Defendants' wrongful actions and misconduct as detailed further below.

## PARTIES

7.    Plaintiff Li Fen Yao is the widow of the Sam Chen. She is a resident of Rockville, Maryland, where she resided with her husband at the time of his passing. Ms. Yao is the personal representative of the Estate pursuant to Letters of Administration issued on January 27, 2023, by the Register of Wills for Montgomery County, Maryland.

8.    Defendant Robert Chen is an individual, residing in Bellevue, Washington.

9.    Defendant Otter Audits is a limited liability company formed under the laws of South Dakota, with a principal place of business located in Sioux Falls, South Dakota. On information and belief, Defendant Robert Chen is the sole member of Otter Audits.

10.    Defendant RC Security is a limited liability company formed under the laws of South Dakota, with a principal place of business located in Sioux Falls, South Dakota. On information and belief, Defendant Robert Chen is the sole member of RC Security.

## JURISDICTION AND VENUE

11.    Plaintiff asserts claims against Defendants arising under and pursuant to the Lanham Act, 15 U.S.C. § 1125, over which this Court has original subject matter jurisdiction pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331. The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

12.    This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a), because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between the parties.

13.    Defendants are subject to personal jurisdiction in this judicial district pursuant to Fed. R. Civ. P. 4 and Md. Code Ann. Courts & Jud. Proc. §6-103(b).

14.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

### A. The Formation and Growth of OtterSec

15.     OtterSec is a limited liability company that was formed on February 8, 2022,

pursuant to the Wyoming Limited Liability Company Act, Wyo. Stat. Ann. § 17-29-101, *et*

*seq*. Sam Chen and Robert Chen were initially the only two members of OtterSec and remained

the only two members of OtterSec until Sam Chen passed away on July 13, 2022, at which

time Sam's interest in OtterSec passed to the Estate.

16.     OtterSec was engaged in the business of performing security assessments of

software code used by companies operating on the blockchain. OtterSec audited code for

security flaws or weaknesses that potentially exposed clients to risks from malicious actors,

such as hackers and other cybercriminals, seeking to exploit vulnerabilities for personal gain

or other nefarious reasons.

17.     OtterSec was the brainchild of Robert Chen and Sam Chen's minor son, David

Chen ("David" or "David Chen"). David, who was sixteen years old and still in high school

when OtterSec was formed, had demonstrated an exceptional aptitude for computer coding,

and the digital asset world generally, from a very early age. He regularly competed in cyber

security competitions and, before OtterSec was formed, developed his own computer code for

decentralized finance liquidations that performed remarkably well.

18.      David was introduced to Robert Chen in 2019 while participating in a cyber

security competition that Robert helped to organize. David's cyber security competition team

eventually partnered with Robert's team in 2021, and they began working together. Robert was

impressed by David and even recommended him for an internship with a burgeoning cyber

security firm.

19.     In early February 2022, Robert approached David with a proposal to start their

own cyber security company together. Robert, who was an adult, knew that David was still a

minor and in high school. David indicated to Robert that he was interested and expressed his desire to pursue the idea further.

20.     Robert and David then began working together on the business concept that would eventually become OtterSec. However, in the course of developing their idea, they encountered various obstacles due to David's status as a minor. Robert thus suggested that David's father, Sam Chen, be the co-owner of OtterSec.

21.     David's parents were protective of their minor son, but well-aware of his talents. They did not wish to discourage his entrepreneurial spirit and agreed that Sam Chen would co-own OtterSec with Robert.

22.     Accordingly, after OtterSec was legally formed, Sam Chen and Robert Chen entered into an operating agreement for the company on February 14, 2022 (the "Operating Agreement"). Pursuant to the Operating Agreement, Sam and Robert agreed that OtterSec was to be member-managed, that Sam and Robert were the only members of OtterSec, and that each owned a 50% interest in the company.

23.     David was actively involved in OtterSec from the outset, using his talents, know-how and burgeoning reputation to help grow the business in his spare time, when not otherwise occupied by his high school course work, family obligations, and other activities.

24.     David also used, and allowed OtterSec to use, personal resources that he purchased and/or developed on his own, utilizing his own time and money, prior to the formation of OtterSec. These included, in addition to his own code, relationships, auditing strategies, computer hardware, and accounts.

25.     The company eventually hired employees and consultants who were required to execute agreements (the "OtterSec Employment Agreements") that included restrictions on the use or disclosure of "Confidential Information" and required them to return any and all such "Confidential Information" to OtterSec upon the termination of their agreements.

26.    The OtterSec Employment Agreements also included (a) "Work for Hire" provisions, pursuant to which the employee or consultant expressly agreed that everything he or she "creates, writes or develops in the course of providing" services to OtterSec "shall be 'works made for hire' as defined by U.S. copyright law" and the property of OtterSec, (b) non-competition clauses, prohibiting the employees or consultants from working with, owning or having any financial interest in, or lending his or her name to any competing business "anywhere in the world" during the term of their agreements and for a period of time thereafter, and (c) non-solicitation provisions, prohibiting the direct or indirect solicitation of clients, prospective clients, other employees, and agents, contractors or vendors of OtterSec during the term of their agreements and for a period of time thereafter.

27.    Each of the OtterSec Employment Agreements was signed by Robert Chen for OtterSec and granted him authority to modify or waive them only to the extent that the modification or waiver "would not significantly harm the Company's legitimate, protectible interests." Any such modification or waiver was required to be in writing.

28.    David Chen executed no such agreement with OtterSec and was never asked to execute any such agreement with OtterSec.

**B. Robert Chen's Undisclosed Discussions with Jump Crypto**

29.    OtterSec experienced explosive growth from the outset and generated over $1 million in revenue in its first two months of operations. By March of 2022, Robert began to explore opportunities to raise money for OtterSec. He disclosed to David that he was engaged in preliminary discussions with two potential investors, Sino Global Capital and Race Capital, and David participated with Robert in calls with representatives of both. The discussions with Sino Global Capital and Race Capital did not progress any further.

30.    By no later than April 13, 2022, Robert entered into discussions in earnest with principals of Jump Trading, including Jonathan Claudius and Hendrik Hofstadt, regarding a

possible acquisition of OtterSec. Jump Trading is a registered broker-dealer with over 700 employees worldwide, and a member of multiple exchanges based in the United States and Europe, including the CME Group, the New York Stock Exchange, Eurex, and the London Stock Exchange.

31.    Robert's discussions with Messrs. Claudius and Hofstadt were focused on a potential acquisition of OtterSec by Jump Crypto, which at the time was a division of Jump Trading. Jump Trading had launched Jump Crypto in September of 2021 to focus on the growth and development of blockchain ecosystems and cryptocurrencies. Although Jump Trading and Jump Crypto (together, "Jump") had an in-house software auditing team, Jump was also a client of OtterSec and was interested in acquiring OtterSec because of the skills and talent of OtterSec's employees.

32.    Unlike with the Sino Global Capital and Race Capital discussions, Robert did not initially disclose his discussions with Jump to David (or Sam Chen) and did not involve David (or Sam Chen) in any of his initial discussions with Jump. Nonetheless, these discussions occurred, as confirmed by text messages exchanged between Robert and Jonathan Claudius.

33.    In the early morning hours of April 14, 2022, Robert sent a message to Jonathan Claudius, thanking him for "setting up the chat with Hendrick" and stating that it "was great to hear his perspective about being acquired by jump." Robert told Mr. Claudius that he "gathered up some approximate numbers" for OtterSec and advised that revenues for OtterSec's first two months of operations were approximately $1.36 million. He also told Mr. Claudius that he thought OtterSec's revenue would "stabilize at ~ 1-2 million per month" and that "[p]rofit margins are ~ 80% right now."

34.    In response, Mr. Claudius told Robert that, "for next steps, I was thinking of getting Kanav involved." "Kanav" is Kanav Kariya, the President of Jump Crypto. When Robert asked Mr. Claudius to "clarify what 'getting kanav involved' implies," Mr. Claudius

replied, "Yeah, probably a call with Kanav, if that jives well, I suspect the next step would be to make you an offer." Mr. Claudius then agreed to set up a telephone call between Robert and Mr. Kariya for Monday, April 18, 2022.

35.    Sam and David Chen were not parties to these discussions between Robert and Messrs. Claudius and Hofstadt, did not know that they had taken place, and Robert did not disclose them at the time to either of Sam or David.

36.    Instead, late in the day on April 14, 2022, Robert reached out to David asking to speak about raising money for OtterSec. Robert did not mention his discussions with Messrs. Claudius and Hofstadt, and stated only that he was "talking to some potential vcs." He characterized those discussions broadly as efforts to build "connections" with a view towards raising "500k" in exchange for about "2.5% equity."

37.    David pressed Robert for details, even asking him specifically, "what's the real reason you want investment?" and noting to Robert that he had "been very deflective about it in the past." Robert kept the discussion at a high-level, explaining only generally that he believed it would benefit the company to raise money because it would better position OtterSec to handle more clients and that "outside investment would definitely help somewhat with connections."

38.    Although David continued to ask for more specifics about Robert's discussions with the "potential vcs," Robert simply told David that he had been "connected … w/ a company today" but did not mention that the "company" was Jump. Robert also concealed that his discussions with that "company" were "about being acquired" and affirmatively misrepresented them as being associated with his efforts to build "connections." Robert, in fact, specifically represented to David that his plan at that point was only to raise money for OtterSec from "friends and family."

39. Robert misrepresented and failed to disclose the highly material facts that he was keenly aware of – namely, that (a) the "company" he had been "connected" with that day was Jump, (b) Jump was interested in acquiring OtterSec, (c) Robert had already provided Jump with financial details concerning OtterSec's revenue and profitability, (d) Robert's discussions with Jump were being elevated to a forthcoming call with Mr. Kariya, the President of Jump Crypto, scheduled for April 18, 2022, and (e) if the call with Mr. Kariya went well, the next step would be "an offer" from Jump.

40. Sam and David Chen first learned of Robert's discussions with Jump after Sam agreed a few days later, on April 16, 2022, to amend the Operating Agreement and transfer 10% of Sam's membership interests in OtterSec to Robert.

**C. The First Amendment to the Operating Agreement**

41. OtterSec's explosive growth was due in significant part to David's exceptional dedication and work ethic. From the outset, David worked for OtterSec late-nights after high school, sometimes even before or during school, and on weekends.

42. Nevertheless, Robert frequently expressed to David that he was dissatisfied with the amount of time David was dedicating to the business, and as OtterSec grew Robert became increasingly demanding of David's time. Robert even encouraged David to miss high school to work for OtterSec, or to drop-out of school entirely so that he could dedicate himself to the company full-time.

43. David did not wish to drop-out of high school and, by April 2022, the combination of David's high school responsibilities and browbeating from Robert was taking a severe toll on David's physical and mental health. He reached a breaking point by April 15, 2022, and concluded that he would be unable to dedicate the time to OtterSec that Robert was consistently demanding of him.

44.     However, before advising Robert, David approached his father and proposed that Sam agree to transfer 10% of his membership interests in OtterSec to Robert. David expressed to Sam his view that the 10% transfer might appease Robert and help to resolve any disharmony over David's inability to dedicate himself to OtterSec full-time, which he believed would benefit the company.

45.     Although Sam agreed to David's proposal, neither Sam nor David was aware at the time of Robert's discussions with Jump because of Robert's material misrepresentations and omissions.

46.     On the basis of Robert's misrepresentations and omissions, David contacted Robert in the afternoon of April 15, 2022. He expressed to Robert his plan to finish high school, his regret that he would be unable to dedicate himself to OtterSec full-time, and conveyed the proposal for Sam to transfer 10% of his membership interests to Robert.

47.     Without revealing and continuing to conceal the highly material facts he actually knew about Jump, Robert accepted. Robert also conveyed to David that he "hope[d] this doesn't mean you'll adjust ur work down." David responded that he did not intend to adjust his work down, but could not "adjust my work up any further."

48.     Remaining unaware of the material facts concerning Jump that Robert had misrepresented and concealed, Sam agreed to an Amended Operating Agreement for OtterSec the next day, on April 16, 2022 (the "First Amendment"). Pursuant to the First Amendment, Sam transferred 10% of his membership interests to Robert, resulting in Robert owning 60% of OtterSec and Sam owning 40%.

49.     Had Robert disclosed what he actually knew about Jump, as he was required to do, Sam would not have agreed to the transfer or the First Amendment.

**D. The Offer from Jump Crypto**

50.     On April 18, 2022, Robert proceeded with his scheduled discussion with Mr. Kariya. Neither Sam nor David was invited to participate or made aware of the discussion at the time. Nonetheless, the discussion is confirmed by a text message Robert sent that day to Jonathan Claudius at 12:51 p.m., in which Robert stated that he "had a nice chat with kanav, I think we're moving forward with the acquihire offer."

51.     An "acquihire" is a term that is often used in the start-up tech-industry, and generally refers to the purchase of a company for the purpose of acquiring its employees. The acquiring company in an "acquihire" is primarily interested in the skill set or expertise of the target company's employees, rather than its products or services.

52.     At least some of the terms of the "acquihire" that Robert discussed with Mr. Kariya were detailed in a follow-up text message exchange between them that began on the morning of April 19, 2022. According to a log of their discussion (which did not include Sam or David Chen), Jump proposed for Robert to "bring 3-5 of your top guys in" and, during the period of transitioning OtterSec's employees to Jump, OtterSec would get to "keep the money" while they "work on winding down the contracts in a reasonable time frame."

53.     Robert advised David of his discussions with Jump for the first time in the afternoon of April 18, 2022, although he continued to conceal that those discussions had actually commenced prior to the First Amendment. Robert represented to David that Jump was proposing an acquihire, which David understood in the traditional sense to mean a purchase of OtterSec by Jump for the purpose of acquiring the talent of its personnel. Robert then invited David to participate in a call with Mr. Kariya later that afternoon.

54.     Mr. Kariya did not show up for the call on April 18, and Robert attempted to arrange for a rescheduled call. On Wednesday, April 20, 2022, Robert reached out to David asking if David could "skip school" the next day for a "jump meeting at 10am." David advised

Robert that he was "not going to be at school" and would be available because he was still "quarantining" as a result of an earlier COVID diagnosis. The call was eventually rescheduled to Friday, April 22, 2022 at 5:30 p.m.

55.    In the interim, and unbeknownst to David or Sam Chen, Robert was continuing his side-discussions with Jonathan Claudius. For example, on April 21, 2022, Mr. Claudius sent a text message to Robert, thanking him for the opportunity "to meet everyone" and asking Robert for the names and work experience of the employees Robert would bring to Jump.

56.    Robert responded that, in addition to himself, he "would probably just want to bring on william + kevin full time into jump for now (keep it smaller at first)." "[W]illiam" referred to William Wang and "kevin" referred to Kevin Chow, both of whom, as Robert later acknowledged, had executed OtterSec Employment Agreements containing the confidentiality, non-competition, non-solicitation, and other provisions referenced above.

57.    Mr. Claudius then proceeded to request additional details from Robert. He asked, "ok, so if we put together an offer it would be for OSec + You/Will/Kevin? Or for just you/will/kevin as fulltime staff?" Robert responded that "the former would make more sense" and stated that "it wouldn't make sense for me to still have significant equity in osec while focusing on work at jump." He then falsely claimed that he had spoken with David, and that David had told him that "he would want to stay at osec as long as he also got part of the acquihire bonus" and suggested that "maybe david can stay at osec to help manage the remaining people + smooth out the transition."

58.    David spoke with Mr. Kariya the next day, April 22, 2022, remaining unaware of Robert's discussions with Mr. Kariya the day before. During their call, Mr. Kariya conveyed the proposal Robert made to Mr. Claudius the day before, as though it was his own. David was surprised to hear that the supposed "acquihire" would not initially include him or an acquisition of Sam Chen's membership interest in OtterSec.

59.     David then spoke with Robert later the same day, April 22, 2022, after his call

with Mr. Kariya. David relayed what they discussed and Robert not only pretended as though

he did not to know about it, but he also concealed that he had been the one to propose for the

supposed "aquihire" to be limited to himself, William Wang, and Kevin Chow. Worse, Robert

attempted to persuade David that the idea made sense, telling him that it would be "very useful

to have one of us at jump and the other running osec cause we can funnel audits back." They

then agreed to "wait for them to send the paperwork" before reaching a final decision, and

David began to digest what had been discussed.

60.     Robert proceeded to follow-up variously with Messrs. Claudius and Kariya in

the days that followed, unbeknownst to David or Sam and without disclosing his discussions

to them.

61.     On April 29, 2022, Mr. Kariya sent Jump's offer to Robert by text message.

Jump proposed for Robert to receive a "$2m sign on," "$500k CIB," "$1.5m guaranteed min

bonus for 2 years," and a "$150k base." Robert did not disclose the offer to David or Sam.

62.     Moreover, after negotiating for and receiving his own offer, and while still a

member of OtterSec, Robert negotiated offers for William Wang and Kevin Chow with Mr.

Claudius. In text messages they exchanged on May 5, 2022, Robert advised Mr. Claudius that

"they'll both follow with no issue." They then discussed potential compensation terms for

William Wang and Kevin Chow, and Mr. Claudius advised Robert that he would "get you the

written offer" for both.

63.     Later that same day, Mr. Claudius also texted Robert that he wanted "to

introduce you to my boss (Alex) via email, who functions as Jump Trading CTO, so you can

meet him." Robert immediately responded and asked, "will this be via my osec email? or my

personal[?]" Mr. Claudius replied, "you pick I can do either" – to which Robert responded,

"let's do personal, me@robertchen.cc".

64.     On May 5, 2022, Mr. Claudius texted Robert, asking: "Any chance you, Kevin, or [W]ill have non-competes in place that would prevent bringing kevin and will along?" Robert responded and, confirming his knowledge of the terms of the OtterSec Employment Agreements, advised that "kevin and will both have non-compete clauses in their contract that prevent them from joining other audit firms" but that "it also specifies that the founder (me) can void it." Robert did not inform Mr. Claudius that he was only permitted to "void" the "non-compete clauses" to the extent that it "would not significantly harm the Company's legitimate, protectible interests."

65.     Neither Sam nor David were included in these discussions with Mr. Claudius, and Robert did not disclose them to either of Sam or David.

**E.  The Corrosion of Robert's Relationship with Sam and David**

66.     After Sam and Robert executed the First Amendment on April 16, 2022, David continued to work for OtterSec consistent with his agreement not to adjust his work down or up any further. However, Robert persisted to make increasing demands of David's time and continued to criticize his work ethic when David was unavailable for projects due to his high school responsibilities.

67.     Moreover, after considering his conversations with Mr. Kariya and Robert on April 22, 2022, David was growing suspicious that Robert was not being forthright.

68.     Indeed, although David had been led by Robert to believe that he was discussing an "acquihire" with Jump, it was becoming apparent to David that Jump was not actually proposing an "acquihire." David was attuned to the fact that he had not been involved in discussions between Robert and Jump, and after reflecting upon his discussions with Mr. Kariya and Robert earlier that day it appeared to David that Robert had actually been negotiating a very different deal with Jump – one for Robert and other valuable OtterSec employees who had OtterSec Employment Agreements.

69.     David expressed his views to Robert, beginning on April 22, 2022. Robert feigned ignorance and attempted to assuage David's concerns that he had been acting for himself and in his own interests to the detriment of OtterSec.

70.     However, on the basis of David's observations of the manner in which the discussions with Robert and Jump had proceeded, David had lost faith in Robert's integrity. After some back and forth with Robert, David concluded by April 27, 2022, that he could no longer work with someone he did not trust and advised Robert that he would cease any further work for OtterSec.

71.     Thereafter, David either took with him or removed Robert's and OtterSec's access to the personal code and other property that David had been using or allowing them to use previously. David notified Robert that he would be doing so, and Robert assented.

72.     Subsequently, Robert asked David, over text on April 29, 2022, to return a specific subset of computer code, which he referred to as the "drift liquidator" code, that Robert claimed to own. David immediately returned it.

73.     In the days and weeks that followed, Robert made a few additional requests for other information and materials related to OtterSec and, in each case, David provided the information or materials to Robert to the extent he had them. Otherwise, Robert raised no objections and took no action with respect to David's removal or retention of any other property or information.

74.     Robert did, however, begin pressing for the remainder of Sam's membership interests, taking the position that it would be "unfair" for Sam to retain his 40% interest in OtterSec if David was no longer working for the company. Neither Sam nor David agreed with Robert's position, and they began requesting various documents and information relating to OtterSec and Robert's discussions with Jump. Robert responded by stonewalling.

75.    For example, at one point, Sam and David simply requested from Robert a copy of the First Amendment. Robert refused, but David was eventually able to locate it in his own records.

76.    Sam and David also requested that Robert share the logs of his discussions with the principals of Jump, but Robert refused. When they specifically asked Robert on May 4, 2022, to disclose the details of his negotiations with Jump, Robert initially dodged the question altogether, stating only that he would "let you know if/when I make a decision with jump." He revisited that response shortly thereafter and disclosed for the first time that "jump made an offer to just me." Robert falsely represented that "the details are still up in the air but this is all that I know."

77.    Robert then began to inquire about purchasing Sam's 40% interest in OtterSec. In a text message sent by Robert to David on May 10, 2022, Robert threatened that, if Sam was unwilling to sell his membership interests, "i'll probably dissolve the company and remake it." David accurately noted to Robert in a reply text message sent on May 13, 2022, that Robert was precluded from doing so.

78.    Indeed, although David did not point it out at the time specifically, both the Operating Agreement and the First Amendment included a provision in Section 8.1 that precluded any member from dissolving the company "for a loss of membership interest" – which was precisely what Robert was proposing to do.

79.    Moreover, Robert was still a fiduciary and, by that point, already highly conflicted, self-interested, and lacking in the requisite independence to be entitled to any deference whatsoever that he could act in the best interests of OtterSec or its members with respect to any decision concerning a dissolution of OtterSec. Indeed, OtterSec was highly successful and there could be no legitimate basis to "dissolve the company and remake it," except to further Robert's personal interest in having the entire company for himself.

80.     Nevertheless, David conveyed to Robert that Sam was willing to consider selling his membership interests. In order to determine the value of those interests, however, David requested that Robert disclose certain financial information and information in relation to the Jump "acquihire." Robert refused, and the parties did not reach an agreement.

81.     By that point, whatever trust there had been between the parties had evaporated completely and their dealings with each other were consistently acrimonious. After David pointed out to Robert that his conduct and actions appeared rife with conflicts of interest and were contrary to Robert's fiduciary duties, Robert tacitly conceded the validity of David's view when he again threatened, in a message sent on May 13, 2022, to "forfeit all my shares, and just start a new firm with no fiduciary conflict."

**F. Robert Chen's Theft of OtterSec**

82.     On May 27, 2022, Iquan Fadaei, an attorney purporting to act on behalf of OtterSec, sent an email to Sam and David Chen advising that "Robert will be exercising his right to dissolve OtterSec shortly." Mr. Fadaei did not offer an explanation or business justification for a dissolution of OtterSec.

83.     However, on May 28-29, 2022, Robert exchanged text messages with an acquaintance he shared with David. Robert told the acquaintance that he had "signed" a deal with Jump. The acquaintance congratulated Robert and asked him what he planned to do "now that ur like officially a millionaire." Robert responded that he needed to pay "taxes" and, when the acquaintance asked if "the deal" was "all cash," Robert told him that the "deal [is] a bit weird" and "i think im gonna gap year and explore the world."

84.     The acquaintance also asked Robert in the same exchange if "everyone at osec [is] gonna work for jump now" and Robert responded, "that's the messy part[,] i think i'll figure out as we go." The acquaintance then asked whether Robert specifically would be working for Jump, and Robert replied that it was "another thing to be decided soon."

85.    The acquaintance asked Robert about David and inquired whether Robert expected to be sued "now that uve signed the jump deal." Robert replied, "nah the deal we structured is entirely legal" and described it as a "partial share acquisition" that "might change."

86.    During their discussion, Robert was also careful to tell the acquaintance that he "should not tell anybody abt this for now." However, the acquaintance did indeed tell David about his discussion with Robert.

87.    In the weeks that followed, David and Robert continued to exchange messages, and Robert consistently refused to share the details of his offer from and discussions with Jump, variously claiming that they were "personal" or "confidential," or that they did not have "anything to do with osec" because (and contrary to what he had told the acquaintance) the deal with Jump was "not a share acquisition."

88.    Robert, moreover, would not even answer questions about the OtterSec employees involved in the supposed "acquihire," whose deals with Jump were being negotiated by Robert despite Robert's continuing fiduciary duties to OtterSec and the terms of the OtterSec Employment Agreements.

89.    Sam and David retained their own counsel, the law firm of Hathaway & Kunz, LLP ("Hathaway"), and advised OtterSec's attorney of the same by email on June 1, 2022.

90.    Following a preliminary discussion between counsel, Mr. Fadaei followed up with Hathaway by email on June 4, 2022. Among other things, Mr. Fadaei claimed that Robert "has a right to dissolve the company" based on his "60% ownership interest" and confirmed Robert's intent to proceed with the dissolution. His email also set forth Robert's plan for dissolution, which included having "each member submit bids for the various intangible assets they are interested in owning."

91.    The email from Mr. Fadaei then proceeded to set forth "an initial list of the company's assets" which included, among other things, client agreements, intellectual property

allegedly belonging to OtterSec (which he later amended in subsequent correspondence), OtterSec's "Twitter account," "Blog posts," the "Company name, website, domain and general goodwill," cash of approximately $500,000, and amounts owed to OtterSec for work it had performed.

92.     By letter dated June 9, 2022, Hathaway proceeded to serve OtterSec with a formal, statutory demand for various categories of records and information relating to OtterSec pursuant to Wyoming law, and in the same letter raised several concerns and objections to Robert's proposed plan of dissolution.

93.     Mr. Fadaei responded on June 23, 2022. The response contended that, because "Robert owns 60% of the Company's capital interests ... he is authorized to dissolve the Company whenever he so decides." Mr. Fadaei also represented that "[t]he Company will seek to maximize the value of any of its assets sold as part of the dissolution" but that "as a practical matter, the Company is not aware of any interested third parties."

94.     Mr. Fadaei's June 23, 2022, response agreed to produce some, but not all, of the records and information relating to OtterSec that were requested by Hathaway's demand letter dated June 9, 2022. Notably, Mr. Fadaei's letter agreed only to provide selected communications concerning Robert's discussions with Jump and stated that "[t]he Company disagrees with your claim that communications regarding Jump Crypto's hiring of Robert Chen are related to the Company's business." The letter also alleged that "Jump Crypto is no longer interested in hiring any Company personnel and did not ever hire any personnel" and, further, that "[t]he Company has not terminated any employee or independent contractor contracts in connection with Jump Crypto or otherwise."

95.     Moreover, Mr. Fadaei's June 23, 2022, response raised for the first time claims of "misappropriation and competition" arising out of David's departure from OtterSec that he alleged were breaches of David's "fiduciary duty of care and loyalty" – even though David was

not a member of the company and owed no such duties. The letter made counter-demands for various categories of documents and information associated with the alleged violations of David's non-existent fiduciary duties.

96.     After Hathaway responded, Mr. Fadaei withdrew several aspects of the allegations against David. Hathaway also confronted Robert, through Mr. Fadaei, with Robert's communications with the acquaintance on May 28-29, 2022, relating to the "deal" he had reached with Jump that was "structured" as a "partial share acquisition." Robert responded through Mr. Fadaei by claiming that he had lied to the acquaintance, but continued to withhold many of his communications with Jump.

97.     While the parties were still discussing their disputes, Sam tragically passed away in a car accident on July 13, 2022. At the time of his passing, OtterSec had not been dissolved and Sam's membership interest in the company passed to the Estate.

98.     Although the First Amendment, which was theoretically in effect at the time of Sam's death, would have required OtterSec to dissolve upon Sam's death, Robert executed a further amendment to the Operating Agreement on August 15, 2022 (the "Second Amendment"). The Second Amendment removed that provision so as to require dissolution upon the "termination of the membership of all members of the Company." The Second Amendment also added a provision stating: "For the avoidance of doubt, the dissociation of a member shall not cause the dissolution of the Company."

99.     However, notwithstanding the Second Amendment, Robert proceeded to follow through with the threat he made months earlier to "dissolve the company and remake it."

100.    On September 13, 2022, while he was still a member and fiduciary of OtterSec, Robert secretly formed two new companies in South Dakota: Defendants Otter Audits and RC Security.

101.    Next, Mr. Fadaei notified Hathaway on September 20, 2022, that "Robert has dissolved OtterSec LLC, and the company is now beginning to wind up." Articles of Dissolution were not filed with the Wyoming Secretary of State until October 6, 2022.

102.    Mr. Fadaei also emailed Hathaway on September 20, 2022, stating that "[p]art of the winding up process will involve the sale of Company assets" and attaching "a list of assets that prospective purchasers may offer to purchase from the Company." The list of assets changed from the original list he sent on June 4, 2022, but continued to include digital assets, "OtterSec trademarks," the "OtterSec website and domain name," "OtterSec code," and various "Communication and Operational Accounts" that included the "Company's Discord, Slack, Notion, and GSuite accounts."

103.    Robert did not make any offer to purchase the listed assets and did not disclose his formation of Otter Audits and RC Security in any of these communications or otherwise, because the last part of his plan to "dissolve the company and remake it" – which he has since executed on – was to simply take the listed assets (and others) for Otter Audits and RC Security, continue the exact same business through them, and thereby steal OtterSec for himself.

104.    It is evident that Robert formed his new companies in South Dakota, rather than Wyoming, to avoid detection and circumvent Wyoming law prohibiting the use of a name (like "Otter Audits") that is the same as, or deceptively similar to, the name "OtterSec."[2] Robert's scheme to "dissolve the company and remake it" specifically included using a deceptively similar name and other means to capitalize on OtterSec's name and goodwill, and confuse third parties by outwardly portraying his new companies as though they are OtterSec.

105.    Indeed, despite having previously represented that "the Company is not aware of any … third parties" interested in acquiring any the OtterSec's assets included on the list prepared by Mr. Fadaei, Robert plainly took at least some of those assets for Otter Audits and

---

[2] See Wyo. Stat. Ann. § 17-29-108(a)(ii) (2015)

RC Security, including specifically "OtterSec trademarks," the "OtterSec website and domain name," and OtterSec "Communication and Operational Accounts."

106.    For example, Robert is using the "OtterSec website and domain name" for his companies' website (https://osec.io), which on the front page displays the OtterSec name and logo, lists OtterSec's clients, and describes a business identical to OtterSec:



107.    Robert has also appropriated OtterSec's social media accounts for his new companies, including its verified Twitter account:



108.    Notably, despite OtterSec's "dissolution," the verified Twitter account has remained active utilizing the OtterSec name and logo, links to the OtterSec website, includes all of OtterSec's pre-dissolution Tweets, describes a business identical to OtterSec, and even

notes that it was created in February 2022 – which was when OtterSec was formed, not Otter Audits or RC Security.

109.    The transfer of OtterSec's assets and property to Defendants Otter Audits and RC Security is a classic example of a de facto merger, and Otter Audits and RC Security are the essence of a mere continuation of OtterSec. The dissolution of OtterSec and formation of Otter Audits and RC Security were fraudulent transactions arranged and effectuated by Robert Chen, in violation of his fiduciary duties, in furtherance of his scheme to "dissolve the company and remake it" without Sam Chen or the Estate.

110.    Otter Audits and RC Security are the successors to OtterSec, and the Estate is therefore entitled to the same interest in Otter Audits and RC Security as it would be entitled to in OtterSec, together with an award of damages, profits, costs, and other relief as further detailed below.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)
### (Against All Defendants)

111.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

112.    In connection with their commercial services, Defendants have used and are continuing to use in interstate commerce the OtterSec name, logo, trademarks, website, domain name, and social media and other communication accounts.

113.    Defendants use of the OtterSec name, logo, trademarks, website, domain name, and social media and other communication accounts falsely portrays themselves as being OtterSec and constitute false or misleading descriptions or representations of fact.

114.    Defendants use of the OtterSec name, logo, trademarks, website, domain name, and social media and other communication accounts are likely to cause (or are actually causing)

confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of Defendants with OtterSec, or as to the origin, sponsorship or approval of Defendants' services or commercial activities by OtterSec.

115.    In addition, Defendants' use of the OtterSec name, logo, trademarks, website, domain name, and social media and other communication accounts for purposes of commercial advertising or promotion, misrepresents the nature, characteristics, qualities or origin of Defendants' services or commercial activities.

116.    Defendants' false or misleading representations of fact are material because they are intended and likely to influence the decisions of existing and target clients, employees, consumers, and other third parties who are interested in Defendants' services or commercial activities.

117.    Defendants, in fact, are using the OtterSec name, logo, trademarks, website, domain name, and social media and other communication accounts for the express purpose of concealing from existing and target clients, employees, consumers, and other third parties their misappropriation and theft of OtterSec.

118.    Defendants' false or misleading representations of fact are being widely disseminated in interstate commerce, including to the relevant industry and purchasing public.

119.    The Estate has been damaged by Defendants' false or misleading representations of fact through the non-payment for Defendants' use of the OtterSec name, logo, trademarks, website, domain name, and social media and other communication accounts, the diversion of OtterSec's business and opportunities, and the loss of the Estate's interest in the company.

120.    Defendants know that their representations of fact are false or misleading, and have made them in bad faith, fraudulently, maliciously, deliberately, and willfully.

121.    Defendants' actions and conduct makes this an exceptional case within the meaning of 15 U.S.C. § 1117, thereby entitling the Estate to an award of attorneys' fees, in addition to Defendants' profits, damages, and costs.

122.    Defendants are continuing to make false and misleading representations of fact and will continue to do so unless enjoined as provided in 15 U.S.C. § 1116.

## SECOND CAUSE OF ACTION
### Declaratory Judgment, 28 U.S.C §§ 2201 and 2202
### (Against All Defendants)

123.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

124.    The Declaratory Judgment Act, 28 U.S.C §§ 2201 and 2202, authorizes this Court to declare the rights and legal relations of the parties to this dispute, and to award necessary and proper relief based thereon.

125.    An actual controversy has arisen and now exists between the Estate and Defendants, concerning their respective rights in and to the companies that were formerly known as OtterSec, but which are now known as Otter Audits and RC Security.

126.    In particular, and as further detailed herein, Plaintiff contends, among other things, that Defendant Robert Chen acted without right or authority, in violation of his fiduciary duties of care and loyalty, committed fraud, and breached the Operating Agreement, the First Amendment, and the Second Amendment in connection with the dissolution of OtterSec and formation of Otter Audits and RC Security.

127.    Plaintiff further contends that Robert Chen was highly conflicted, self-interested, and lacking in the requisite independence to consider objectively whether the dissolution of OtterSec was in the best interests of OtterSec or the Estate. Accordingly, his decision to dissolve OtterSec is not entitled to deference under the business judgment rule but

is instead subject to review for "entire fairness." Viewed objectively, the dissolution was not fair, reasonable or in the best interests of OtterSec or the Estate and should be set aside.

128.    Additionally, and as further detailed herein, Plaintiff contends, among other things, that Defendants have violated the Lanham Act, and converted and misappropriated OtterSec's assets, property, goodwill, clients, and business opportunities for themselves. Defendants are using a deceptively similar name as OtterSec, are engaged in the same business as OtterSec, and are holding themselves out as though they are OtterSec.

129.    Accordingly, Plaintiff seeks a declaration as follows:

   a.  Robert Chen's dissolution of OtterSec was improper, invalid, subject to review for entire fairness, and not fair, reasonable or in the best interests of OtterSec or the Estate;

   b.  The transfer of OtterSec's assets and property to Otter Audits and RC Security equates to a de facto merger of the companies;

   c.  Otter Audits and RC Security are a mere continuation of OtterSec;

   d.  The dissolution of OtterSec and formation of Otter Audits and RC Security were fraudulent transactions arranged and effectuated by Robert Chen, in violation of his fiduciary duties, to deprive the Estate of its interest in OtterSec;

   e.  Otter Audits and RC Security are OtterSec's successors in interest; and

   f.  The Estate is entitled to the same interest in Otter Audits and RC Security as the Estate is entitled to have in OtterSec.

130.    Pursuant to and on the basis of the foregoing, Plaintiff seeks the following necessary and proper relief:

   a.  The imposition of a constructive trust over the Estate's rightful interest in Otter Audits and RC Security; and

    b.  The termination of the constructive trust and distribution to the Estate of the

Estate's rightful interest in Otter Audits and RC Security.

**THIRD CAUSE OF ACTION**
**Breach of Fiduciary Duty; Aiding and Abetting Breach of Fiduciary Duty**
**(Against All Defendants)**

131.    Plaintiff repeats and realleges each and every allegation contained above as if

fully set forth herein.

132.    Defendant Robert Chen owed fiduciary duties to OtterSec, Sam Chen, and the

Estate. He was required to act honestly, in good faith, and in the best interests of OtterSec, Sam

Chen, and the Estate, and to exercise the care, diligence, and skill that a reasonably prudent

person would exercise in comparable circumstances.

133.    Defendant Robert Chen repeatedly failed to faithfully execute and violated his

fiduciary duties in relation to, among other things, his dealings with Jump, the conduct and

affairs of OtterSec, the formation of Otter Audits and RC Security, and the dissolution and

winding up of OtterSec.

134.    Defendant Robert Chen was well aware of, and even acknowledged, the

fiduciary duties he owed to OtterSec, Sam Chen, and the Estate. Nevertheless, he willfully,

wantonly, and intentionally abused his position to breach, and to conceal his breaches of, his

fiduciary duties.

135.    As a direct and proximate result of Defendant Robert Chen's breaches of his

fiduciary duties, the Estate has been damaged.

136.    Defendants Otter Audits and RC Security are also liable for aiding and abetting

Robert Chen's breaches of his fiduciary duties. They provided substantial assistance to Robert

Chen in achieving the breaches of his fiduciary duties alleged herein, were proximate causes

of the Estate's losses and damages, and had knowledge of the breaches of fiduciary duty by

and through Robert Chen

## FOURTH CAUSE OF ACTION
### Fraud; Aiding and Abetting Fraud
### (Against All Defendants)

137.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

138.     Defendant Robert Chen made or approved the materially false and misleading statements and omissions specified above in relation his dealings with Jump, the conduct and affairs of OtterSec, the formation of Otter Audits and RC Security, and the dissolution and winding up of OtterSec, which he knew (or deliberately or recklessly disregarded) were false and misleading in that they contained material misrepresentations or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

139.     Defendant Robert Chen made or approved the materially false and misleading statements and omissions specified above to the Estate and Sam Chen directly, or via David Chen with the knowledge or belief that that they would be conveyed to the Estate and Sam Chen and that the Estate and Sam Chen would rely on them.

140.     Defendant Robert Chen had an affirmative duty to provide truthful, full, complete, and accurate disclosures of the material facts that were peculiarly within his knowledge. Defendant Robert Chen intentionally or recklessly failed to provide truthful, full, complete, and accurate disclosures of these material facts.

141.     In addition, in choosing to speak, make representations, and disclose the matters described above in relation to his dealings with Jump, the conduct and affairs of OtterSec, the formation of Otter Audits and RC Security, and the dissolution and winding up of OtterSec, Defendant Robert Chen undertook an affirmative duty to make truthful, full, complete, and accurate disclosures as to those matters and ensure that the representations and disclosures he was making or had previously made were not materially false or misleading or omitted material

facts necessary in order to make the statements he was making or had previously made, in light of the circumstances under which they were made, not materially false or misleading.

142.    The Estate and Sam Chen reasonably and justifiably relied to their detriment on Defendant Robert Chen's material misrepresentations and omissions, including Defendant Robert Chen's affirmative duty to provide truthful, full, complete, and accurate disclosures.

143.    Defendant Robert Chen's material misrepresentations and omissions made on or before April 16, 2022, in relation to his dealings with Jump specifically, fraudulently induced Sam Chen to enter into the First Amendment and transfer 10% of his membership interests in OtterSec to Defendant Robert Chen, which Sam Chen would not have agreed to if he had been aware of the true and complete facts. As a direct and proximate result of these material misrepresentations and omissions, the Estate has been damaged. In addition (or in the alternative), the Estate is entitled to rescission of the transfer of 10% of Sam Chen's membership interests in OtterSec to Defendant Robert Chen, which would restore the parties to their positions prior to Defendant Robert Chen's fraud. Otter Audits and RC Security are OtterSec's successors in interest, such that the Estate is entitled to a 50% interest in Otter Audits and RC Security.

144.    Defendant Robert Chen's material misrepresentations and omissions in relation to his dealings with Jump, the conduct and affairs of OtterSec, the formation of Otter Audits and RC Security, and the dissolution and winding up of OtterSec, further caused and resulted in the dissolution of OtterSec, the transfer of OtterSec's assets and property to Otter Audits and RC Security, and the loss of the Estate's interest in OtterSec. Otter Audits and RC Security are OtterSec's successors in interest. As a direct and proximate result these material misrepresentations and omissions, the Estate has been damaged.

145.    Defendants Otter Audits and RC Security are also liable for aiding and abetting Robert Chen's fraud. They provided substantial assistance to Robert Chen in achieving the

fraud alleged herein, were proximate causes of the Estate's losses and damages, and had

knowledge of the fraud by and through Robert Chen.

**FIFTH CAUSE OF ACTION**
**Misappropriation and Conversion**
**(Against All Defendants)**

146.    Plaintiff repeats and realleges each and every allegation contained above as if

fully set forth herein.

147.    Prior to his death, Sam Chen had legal rights in and title to his membership

interest in OtterSec. Upon Sam's death on July 13, 2022, his interest and the legal rights in and

title to that interest passed to the Estate.

148.    Defendants have wrongfully misappropriated and converted the Estate's interest

in OtterSec, to the exclusion of the Estate. Otter Audits and RC Security are OtterSec's

successors in interest.

149.    Defendants have exercised and are continuing to exercise dominion and control

over the Estate's rightful interests in Otter Audits and RC Security so as to unlawfully deny the

Estate its rightful interest in and to them.

150.    As a direct and proximate result of Defendants' misappropriation and

conversion, the Estate has been damaged.

**SIXTH CAUSE OF ACTION**
**Breach of Contract**
**(Against Robert Chen)**

151.    Plaintiff repeats and realleges each and every allegation contained above as if

fully set forth herein.

152.    Section 8.1 of OtterSec's Operating Agreement, the First Amendment, and the

Second Amendment, prohibited the members of OtterSec, including Defendant Robert Chen,

from dissolving OtterSec "for a loss of membership interest."

153.    In addition, OtterSec's Operating Agreement, the First Amendment, and the Second Amendment included an implied contractual covenant of good faith and fair dealing.

154.    Defendant Robert Chen dissolved OtterSec for the purpose of causing the loss of the Estate's interest in the company, and in furtherance of his scheme to misappropriate OtterSec and the Estate's interest in OtterSec.

155.    By reason of the forgoing, Defendant Robert Chen breached Section 8.1 and the implied covenant of good faith and fair dealing included in OtterSec's Operating Agreement, the First Amendment, and the Second Amendment, and the Estate has been damaged.

## SEVENTH CAUSE OF ACTION
### Tortious Interference
### (Against All Defendants)

156.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

157.    As detailed above, OtterSec had both existing and prospective contracts, relationships, business expectancies, and opportunities with its employees, clients, prospective employees, prospective clients, and other third parties (including Jump).

158.    Defendants were fully aware of these existing and prospective contracts, relationships, business expectancies, and opportunities, and intentionally and improperly interfered with them, by inducing or causing a breach, termination or misappropriation of the contracts, relationships, expectancies, and opportunities.

159.    By reason of Defendants' wrongful, tortious interference with OtterSec's existing and prospective contracts, relationships, business expectancies, and opportunities the Estate has been damaged.

## EIGHTH CAUSE OF ACTION
### Accounting
### (Against All Defendants)

160.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

161.    Defendants have profited through their misappropriation of OtterSec's assets, property, goodwill, clients, and business opportunities, their misappropriation and conversion of the Estate's interests in OtterSec, and their continuing and ongoing denial of the Estate's rightful interest in Otter Audits and RC Security.

162.    Defendants have exercised complete dominion and control over the books, records, and financial affairs of OtterSec, Otter Audits, and RC Security, and have profited and been unjustly enriched thereby, to the exclusion of, and in defiance of the Estate's rights.

163.    Defendants have never accounted for the transactions and affairs of OtterSec, Otter Audits or RC Security, and the Estate is without an adequate remedy at law.

164.    Defendants are obligated to account, and must therefore fully account, for the transactions and affairs of OtterSec, Otter Audits and RC Security.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff respectfully demands judgment in favor of the Estate and against Defendants as follows:

A.    Awarding the Estate profits, damages and costs, attorneys fees, and injunctive relief pursuant to 15 U.S.C. §§ 1116 and 1117;

B.    Awarding the Estate other damages, including punitive damages, in an amount to be determined at trial;

C.    Rescinding the First Amendment and associated transfer of 10% of Sam Chen's membership interests to Defendant Robert Chen;

D.      Declaring and determining the rights and legal relations of the parties to this dispute, and entering relief based thereon, pursuant 28 U.S.C §§ 2201 and 2202 as follows:

(i)      Declaring and determining that Robert Chen's dissolution of OtterSec was improper, invalid, subject to review for entire fairness, and not fair, reasonable or in the best interests of OtterSec or the Estate;

(ii)     Declaring and determining that the transfer of OtterSec's assets and property to Otter Audits and RC Security equates to a de facto merger of the companies;

(iii)    Declaring and determining that Otter Audits and RC Security are a mere continuation of OtterSec;

(iv)     Declaring and determining that the dissolution of OtterSec and formation of Otter Audits and RC Security were fraudulent transactions arranged and effectuated by Robert Chen, in violation of his fiduciary duties, to deprive the Estate of its rightful interest in OtterSec;

(v)      Declaring and determining that Otter Audits and RC Security are OtterSec's successors in interest;

(vi)     Declaring and determining that the Estate is entitled to the same interest in Otter Audits and RC Security as the Estate is entitled to have in OtterSec, equating to a 50% interest, but in any event no less than a 40% interest;

(vii)    Imposing a constructive trust over the Estate's rightful interest in Otter Audits and RC Security; and

(viii)   Terminating the constructive trust and distributing to the Estate its rightful interest in Otter Audits and RC Security.

E.      Requiring Defendants to fully and completely account for the financial affairs and transactions of OtterSec, Otter Audits, and RC Security;

F.      Requiring Defendant Robert Chen to disgorge all compensation and benefits he

obtained during the course of his breaches of his fiduciary duties, faithless service, and other

wrongful conduct described above;

G.      Awarding the Estate pre-judgment and post-judgment interest;

H.      Awarding the Estate costs, expenses, and reasonable attorneys' fees; and

I.      Awarding the Estate such other and further relief as the Court may deem just

and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: March 31, 2023

Respectfully Submitted,
BARKLEY & KENNEDY, CHARTERED


  /S/ Daniel M. Kennedy
By: Daniel M. Kennedy, III
BARKLEY & KENNEDY, CTRD.
51 Monroe Street, Suite 1407
Rockville, Maryland 20850
301-251-6600, 301-762-2606
dkennedy@barkenlaw.com
*Attorneys for Plaintiff*

OF COUNSEL:

Stephen M. Plotnick
Nathan D. Harp
CARTER LEDYARD & MILBURN LLP
28 Liberty Street
New York, NY 10005
212-238-8772
plotnick@clm.com
harp@clm.com

**EXHIBIT 3**

# EXHIBIT 3

STEVEN S. KAUFHOLD, ESQ. (CA SBN 157195)
Email: SKaufhold@KaufholdGaskin.com
JONATHAN B. GASKIN, ESQ. (CA SBN 203625)
Email: JGaskin@KaufholdGaskin.com
LIANA MAYILYAN, ESQ. (CA SBN 295203)
Email: LMayilyan@KaufholdGaskin.com
KAUFHOLD GASKIN LLP
485 Pacific Avenue
San Francisco, CA 94133
Telephone: 415.881.3189
Facsimile: 415.480.6076

Attorneys for Non-Party
Agasi Tax & Financial, PLLC

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MARYLAND**

**SOUTHERN DIVISION**

| | |
|---|---|
| LI FEN YAO, as ADMINISTRATOR OF THE ESTATE OF SAM MINGSAN CHEN, deceased, 13717 Travilah Road Rockville, MD 20850<br><br>Plaintiff,<br><br>-v-<br><br>ROBERT CHEN, 4710 142 Pl. SE Bellevue, WA 98006;<br><br>OTTER AUDITS LLC, 519 West 22nd Street Suite 100 Sioux Falls, SD 57105; and<br><br>RC SECURITY LLC, 519 West 22nd Street Suite 100 Sioux Falls, SD 57105<br><br>Defendants. | CASE NO. 8:23-cv-889-TDC<br><br>**NON-PARTY AGASI TAX & FINANCIAL, PLLC'S OBJECTIONS TO PLAINTIFFS' SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION** |

1       Non-Party Agasi Tax & Financial, PLLC ("Agasi"), by and through counsel, hereby

2  objects, pursuant to Ariz. R. Civ. P. 45(c)(6), to Plaintiff Li Fen Yao, as Administrator of the

3  Estate of Sam Mingsan Chen's ("Plaintiff") Subpoena to Produce Documents, Information, or

4  Objects or to Permit Inspection of Premises in a Civil Action, including "Schedule A") (the

5  "Subpoena") served upon Non-Party Agasi on November 6, 2024, on the following grounds:

6  **GENERAL OBJECTIONS**

7       1.     Non-Party Agasi objects to the Subpoena as improper on the grounds that it was

8  not issued "from the superior court in the county where the production of documents or

9  inspection is to be made," in violation of Ariz. R. Civ. P. 45(c)(1).  Instead, it was purportedly

10  issued by the United States District Court for the District of Maryland, seeking documents from

11  an entity located in Maricopa County, Arizona.  As such, Non-Party Agasi is under no obligation

12  or duty to respond to the improperly issued Subpoena.

13       2.     Non-Party Agasi objects to the Subpoena, including "Schedule A," to the extent

14  that it seeks documents or information that are available from parties to the action, or are

15  otherwise as accessible or more accessible to the requesting party, and therefore Agasi, as a

16  nonparty, should not be put to the time and expense of producing such documents or

17  information.  *See* Ariz. R. Civ. P. 45(e)(1).

18       3.     Non-Party Agasi objects to the Subpoena, including "Schedule A," to the extent

19  that it is overly broad, unduly burdensome, duplicative, not limited in scope to the issues, or time

20  period relevant to the litigation, seeks information concerning unrelated third-party entities, that

21  are neither relevant to the subject matter of this action nor reasonably calculated to lead to the

22  discovery of admissible evidence.

23       4.     Non-Party Agasi objects to each definition and request included in "Schedule A"

24  to the Subpoena, to the extent that it is unduly burdensome as it purports to impose on Agasi, a

25  non-party, any requirement or discovery obligation greater than or different from those under the

26  Arizona Rules of Civil Procedure, or any applicable local rules or orders.

27  **SPECIFIC OBJECTIONS TO DOCUMENT REQUESTS**

28

---

NON-PARTY AGASI TAX & FINANCIAL, PLLC'S OBJECTIONS AND RESPONSES TO
SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT
INSPECTION OF PREMISES IN A CIVIL ACTION
CASE NO: 1:23-CV-03568
2

1    Subject to and without waiving any of her General Objections, and incorporating each of

2  them by reference into each response below, Non-Party Agasi, objects more specifically to

3  Plaintiff's document requests requested in "Schedule A" to the Subpoena:

4  **DOCUMENT REQUEST NO. 1:**

5    All contracts, agreements, engagement letters or other documentation evidencing

6  the relationship between Agasi and Robert Chen, OtterSec, Otter Audits, RC Security or DANS

7  for calendar years 2022 to date.

8  **RESPONSE TO DOCUMENT REQUEST NO. 1:**

9    Nonparty Agasi objects to the Request as it violates Arizona Rules of Civil Procedure

10  45(e)(1) by "imposing undue burden or expense" on Nonparty Agasi, and by seeking the

11  production of materials "that have already been produced in the action or that are available from

12  parties to the action," without good cause.  Ariz. R. Civ. P. 45(e)(1).  Thus, Nonparty Agasi

13  objects to the Request as it requests documents that appear to be either irrelevant or almost

14  entirely duplicative of documents in the possession of one or more parties to the action.  These

15  documents could, to the extent they exist, be acquired more easily and with less expense from the

16  parties, rendering the Subpoena overly broad, unduly burdensome, and oppressively expensive to

17  respond to.  Agasi, as a nonparty, should not be put to the time and expense of producing such

18  documents or information.

19    Nonparty Agasi further objects to this Request on the grounds that the phrase "other

20  documents evidencing the relationship" is vague and ambiguous.   This Request is unduly

21  overbroad and burdensome as it seeks "*all* contracts, agreements, engagement letters or other

22  documentation evidencing the relationship," over the span of two years, with parties and two

23  non-party entities, without any sort of tie to the underlying lawsuit, exposing it as a massive and

24  entirely impermissible fishing expedition.  *See State Farm Mut. Auto. Ins. Co. v. Superior Ct. In*

25  *& For Cnty. of Maricopa,* 167 Ariz. 135, 138 (Ct. App. 1991) (discovery should not be "abused

26  by 'wild fishing expeditions.'").

27

28

---

Non-Party Agasi further objects to this Request because it purports to call for the production of documents or information that are neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence.  *Cornet Stores v. Superior Ct. In & For Yavapai Cnty.,* 108 Ariz. 84, 85 (1972) ("Rule 26(b), Rules of Civil Procedure, 16 A.R.S., provides that any matter relevant to the subject matter or reasonably calculated to lead to the discovery of admissible evidence is discoverable and, of course, conversely irrelevant matters or those not reasonably calculated to lead to discovery of admissible evidence are not discoverable.")

Non-Party Agasi objects to this Request to the extent that it seeks information, including financial, confidential, or other sensitive or private information, that is protected or prohibited from disclosure under applicable law, statutes, regulations, rules, case law, or any other legal authority, including, but not limited to, the right of privacy, as well as any other confidentiality rights possessed by third parties such as Agasi, OtterSec and DANS.

Non-Party Agasi objects to this Request to the extent that it seeks information or documents that are privileged or protected by the accountant-client privilege, or any other applicable privilege.  *See* Ariz. Rev. Stat. Ann. § 32-749.

**DOCUMENT REQUEST NO. 2:**

All documents and communications concerning Robert Chen, OtterSec, Otter Audits, RC Security or DANS for the Relevant Period.

**RESPONSE TO DOCUMENT REQUEST NO. 2:**

Nonparty Agasi objects to the Request as it violates Arizona Rules of Civil Procedure 45(e)(1) by "imposing undue burden or expense" on Nonparty Agasi, and by seeking the production of materials "that have already been produced in the action or that are available from parties to the action," without good cause.  Ariz. R. Civ. P. 45(e)(1).  Thus, Nonparty Agasi objects to the Request as it requests documents that appear to be either irrelevant or almost entirely duplicative of documents in the possession of one or more parties to the action.  These

documents could, to the extent they exist, be acquired more easily and with less expense from the parties, rendering the Subpoena overly broad, unduly burdensome, and oppressively expensive to respond to.  Agasi, as a nonparty, should not be put to the time and expense of producing such documents or information.

This Request is unduly overbroad and burdensome as it seeks "*all* documents and communications concerning" several parties and non-parties, over the span of two years, without any sort of tie to the underlying lawsuit, exposing it as a massive and entirely impermissible fishing expedition.  *See State Farm Mut. Auto. Ins. Co. v. Superior Ct. In & For Cnty. of Maricopa,* 167 Ariz. 135, 138 (Ct. App. 1991) (discovery should not be "abused by 'wild fishing expeditions.'").

Non-Party Agasi further objects to this Request because it purports to call for the production of documents or information that are neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence.  *Cornet Stores v. Superior Ct. In & For Yavapai Cnty.,* 108 Ariz. 84, 85 (1972) ("Rule 26(b), Rules of Civil Procedure, 16 A.R.S., provides that any matter relevant to the subject matter or reasonably calculated to lead to the discovery of admissible evidence is discoverable and, of course, conversely irrelevant matters or those not reasonably calculated to lead to discovery of admissible evidence are not discoverable.")

Non-Party Agasi objects to this Request to the extent that it seeks information, including financial, confidential, or other sensitive or private information, that is protected or prohibited from disclosure under applicable law, statutes, regulations, rules, case law, or any other legal authority, including, but not limited to, the right of privacy, as well as any other confidentiality rights possessed by third parties such as Agasi, OtterSec and DANS.

Non-Party Agasi objects to this Request to the extent that it seeks information or documents that are privileged or protected by the accountant-client privilege, or any other applicable privilege.  *See* Ariz. Rev. Stat. Ann. § 32-749.

**DOCUMENT REQUEST NO. 3:**

All documents and communications concerning Sam Chen, Plaintiff, the Estate or David Chen for the Relevant Period.

**RESPONSE TO DOCUMENT REQUEST NO. 3:**

Nonparty Agasi objects to the Request as it violates Arizona Rules of Civil Procedure 45(e)(1) by "imposing undue burden or expense" on Nonparty Agasi, and by seeking the production of materials "that have already been produced in the action or that are available from parties to the action," without good cause. Ariz. R. Civ. P. 45(e)(1). Thus, Nonparty Agasi objects to the Request as it requests documents that appear to be either irrelevant or almost entirely duplicative of documents in the possession of one or more parties to the action. These documents could, to the extent they exist, be acquired more easily and with less expense from the parties, rendering the Subpoena overly broad, unduly burdensome, and oppressively expensive to respond to. Agasi, as a nonparty, should not be put to the time and expense of producing such documents or information.

This Request is unduly overbroad and burdensome as it seeks "*all* documents and communications concerning" various individuals and entities, over the span of two years, without any sort of tie to the underlying lawsuit, exposing it as a massive and entirely impermissible fishing expedition. *See State Farm Mut. Auto. Ins. Co. v. Superior Ct. In & For Cnty. of Maricopa,* 167 Ariz. 135, 138 (Ct. App. 1991) (discovery should not be "abused by 'wild fishing expeditions.'").

Non-Party Agasi further objects to this Request because it purports to call for the production of documents or information that are neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence. *Cornet Stores v. Superior Ct. In & For Yavapai Cnty.,* 108 Ariz. 84, 85 (1972) ("Rule 26(b), Rules of Civil Procedure, 16 A.R.S., provides that any matter relevant to the subject matter or reasonably calculated to lead to the discovery of admissible evidence is discoverable and, of course,

1    conversely irrelevant matters or those not reasonably calculated to lead to discovery of

2    admissible evidence are not discoverable.")

3         Non-Party Agasi objects to this Request to the extent that it seeks information, including

4    financial, confidential, or other sensitive or private information, that is protected or prohibited

5    from disclosure under applicable law, statutes, regulations, rules, case law, or any other legal

6    authority, including, but not limited to, the right of privacy, as well as any other confidentiality

7    rights possessed by third parties such as Agasi, OtterSec and DANS.

8         Non-Party Agasi objects to this Request to the extent that it seeks information or

9    documents that are privileged or protected by the accountant-client privilege, or any other

10   applicable privilege.  *See* Ariz. Rev. Stat. Ann. § 32-749.

11   **DOCUMENT REQUEST NO. 4:**

12        The entire client files for Robert Chen, OtterSec, Otter Audits, RC Security and DANS

13   for the Relevant Period.

14   **RESPONSE TO DOCUMENT REQUEST NO. 4:**

15        Nonparty Agasi objects to the Request as it violates Arizona Rules of Civil Procedure

16   45(e)(1) by "imposing undue burden or expense" on Nonparty Agasi, and by seeking the

17   production of materials "that have already been produced in the action or that are available from

18   parties to the action," without good cause.  Ariz. R. Civ. P. 45(e)(1).  Thus, Nonparty Agasi

19   objects to the Request as it requests documents that appear to be either irrelevant or almost

20   entirely duplicative of documents in the possession of one or more parties to the action.  These

21   documents could, to the extent they exist, be acquired more easily and with less expense from the

22   parties, rendering the Subpoena overly broad, unduly burdensome, and oppressively expensive to

23   respond to.  Agasi, as a nonparty, should not be put to the time and expense of producing such

24   documents or information.

25        This Request is unduly overbroad and burdensome as it seeks "the entire client files" of

26   Agasi's clients, over the span of two years, without any sort of tie to the underlying lawsuit,

27

28

exposing it as a massive and entirely impermissible fishing expedition.  *See State Farm Mut. Auto. Ins. Co. v. Superior Ct. In & For Cnty. of Maricopa,* 167 Ariz. 135, 138 (Ct. App. 1991) (discovery should not be "abused by 'wild fishing expeditions.'").

Non-Party Agasi further objects to this Request because it purports to call for the production of documents or information that are neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence.  *Cornet Stores v. Superior Ct. In & For Yavapai Cnty.,* 108 Ariz. 84, 85 (1972) ("Rule 26(b), Rules of Civil Procedure, 16 A.R.S., provides that any matter relevant to the subject matter or reasonably calculated to lead to the discovery of admissible evidence is discoverable and, of course, conversely irrelevant matters or those not reasonably calculated to lead to discovery of admissible evidence are not discoverable.")

Non-Party Agasi objects to this Request to the extent that it seeks information, including financial, confidential, or other sensitive or private information, that is protected or prohibited from disclosure under applicable law, statutes, regulations, rules, case law, or any other legal authority, including, but not limited to, the right of privacy, as well as any other confidentiality rights possessed by third parties such as Agasi, OtterSec and DANS.

Non-Party Agasi objects to this Request to the extent that it seeks information or documents that are privileged or protected by the accountant-client privilege, or any other applicable privilege.  *See* Ariz. Rev. Stat. Ann. § 32-749.

**DOCUMENT REQUEST NO. 5:**

All tax records, including federal and state tax returns and all schedules or attachments thereto, for Robert Chen, OtterSec, Otter Audits, RC Security and DANS for calendar years 2022 to date.

**RESPONSE TO DOCUMENT REQUEST NO. 5:**

Nonparty Agasi objects to the Request as it violates Arizona Rules of Civil Procedure 45(e)(1) by "imposing undue burden or expense" on Nonparty Agasi, and by seeking the

production of materials "that have already been produced in the action or that are available from parties to the action," without good cause. Ariz. R. Civ. P. 45(e)(1). Thus, Nonparty Agasi objects to the Request as it requests documents that appear to be either irrelevant or almost entirely duplicative of documents in the possession of one or more parties to the action. These documents could, to the extent they exist, be acquired more easily and with less expense from the parties, rendering the Subpoena overly broad, unduly burdensome, and oppressively expensive to respond to. Agasi, as a nonparty, should not be put to the time and expense of producing such documents or information.

This Request is unduly overbroad and burdensome as it seeks "*all* tax records" of various individuals and entities, including non-parties, over the span of two years, without any sort of tie to the underlying lawsuit, exposing it as a massive and entirely impermissible fishing expedition. *See State Farm Mut. Auto. Ins. Co. v. Superior Ct. In & For Cnty. of Maricopa,* 167 Ariz. 135, 138 (Ct. App. 1991) (discovery should not be "abused by 'wild fishing expeditions.'").

Non-Party Agasi further objects to this Request because it purports to call for the production of documents or information that are neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence. *Cornet Stores v. Superior Ct. In & For Yavapai Cnty.,* 108 Ariz. 84, 85 (1972) ("Rule 26(b), Rules of Civil Procedure, 16 A.R.S., provides that any matter relevant to the subject matter or reasonably calculated to lead to the discovery of admissible evidence is discoverable and, of course, conversely irrelevant matters or those not reasonably calculated to lead to discovery of admissible evidence are not discoverable.")

Non-Party Agasi objects to this Request to the extent that it seeks information, including financial, confidential, or other sensitive or private information, that is protected or prohibited from disclosure under applicable law, statutes, regulations, rules, case law, or any other legal authority, including, but not limited to, the right of privacy, as well as any other confidentiality rights possessed by third parties such as Agasi, OtterSec and DANS.

1    Non-Party Agasi objects to this Request to the extent that it seeks information or

2    documents that are privileged or protected by the accountant-client privilege, or any other

3    applicable privilege.  *See* Ariz. Rev. Stat. Ann. § 32-749.

4    **DOCUMENT REQUEST NO. 6:**

5    All forms W-2, 1099, and K-1 issued by, on behalf of, or to Robert Chen, OtterSec,

6    Otter Audits, RC Security or DANS for calendar years 2022 to date.

7    **RESPONSE TO DOCUMENT REQUEST NO. 6:**

8    Nonparty Agasi objects to the Request as it violates Arizona Rules of Civil Procedure

9    45(e)(1) by "imposing undue burden or expense" on Nonparty Agasi, and by seeking the

10   production of materials "that have already been produced in the action or that are available from

11   parties to the action," without good cause.  Ariz. R. Civ. P. 45(e)(1).  Thus, Nonparty Agasi

12   objects to the Request as it requests documents that appear to be either irrelevant or almost

13   entirely duplicative of documents in the possession of one or more parties to the action.  These

14   documents could, to the extent they exist, be acquired more easily and with less expense from the

15   parties, rendering the Subpoena overly broad, unduly burdensome, and oppressively expensive to

16   respond to.  Agasi, as a nonparty, should not be put to the time and expense of producing such

17   documents or information.

18   This Request is unduly overbroad and burdensome as it seeks "*all* forms W-2, 1099, and

19   K-1" various individuals and entities, over the span of two years, without any sort of tie to the

20   underlying lawsuit, exposing it as a massive and entirely impermissible fishing expedition.  *See*

21   *State Farm Mut. Auto. Ins. Co. v. Superior Ct. In & For Cnty. of Maricopa,* 167 Ariz. 135, 138

22   (Ct. App. 1991) (discovery should not be "abused by 'wild fishing expeditions.'").

23   Non-Party Agasi further objects to this Request because it purports to call for the

24   production of documents or information that are neither relevant to the subject matter of this

25   action nor reasonably calculated to lead to the discovery of admissible evidence.  *Cornet Stores*

26   *v. Superior Ct. In & For Yavapai Cnty.,* 108 Ariz. 84, 85 (1972) ("Rule 26(b), Rules of Civil

27

28

1  Procedure, 16 A.R.S., provides that any matter relevant to the subject matter or reasonably

2  calculated to lead to the discovery of admissible evidence is discoverable and, of course,

3  conversely irrelevant matters or those not reasonably calculated to lead to discovery of

4  admissible evidence are not discoverable.")

5    Non-Party Agasi objects to this Request to the extent that it seeks information, including

6  financial, confidential, or other sensitive or private information, that is protected or prohibited

7  from disclosure under applicable law, statutes, regulations, rules, case law, or any other legal

8  authority, including, but not limited to, the right of privacy, as well as any other confidentiality

9  rights possessed by third parties such as Agasi, OtterSec and DANS.

10    Non-Party Agasi objects to this Request to the extent that it seeks information or

11  documents that are privileged or protected by the accountant-client privilege, or any other

12  applicable privilege.  *See* Ariz. Rev. Stat. Ann. § 32-749.

13  **DOCUMENT REQUEST NO. 7:**

14    All spreadsheets and financial statements or records, including general ledgers,

15  profit and loss statements, payroll records, balance sheets, revenue or income statements, cash

16  flow statements, statements of assets and liabilities, and debt schedules, concerning Robert Chen,

17  OtterSec, Otter Audits, RC Security or DANS for calendar years 2022 to date.

18  **RESPONSE TO DOCUMENT REQUEST NO. 7:**

19    Nonparty Agasi objects to the Request as it violates Arizona Rules of Civil Procedure

20  45(e)(1) by "imposing undue burden or expense" on Nonparty Agasi, and by seeking the

21  production of materials "that have already been produced in the action or that are available from

22  parties to the action," without good cause.  Ariz. R. Civ. P. 45(e)(1).  Thus, Nonparty Agasi

23  objects to the Request as it requests documents that appear to be either irrelevant or almost

24  entirely duplicative of documents in the possession of one or more parties to the action.  These

25  documents could, to the extent they exist, be acquired more easily and with less expense from the

26  parties, rendering the Subpoena overly broad, unduly burdensome, and oppressively expensive to

27

28

respond to.  Agasi, as a nonparty, should not be put to the time and expense of producing such documents or information.

This Request is unduly overbroad and burdensome as it seeks all financial records of various individuals and entities, including non-parties, over the span of two years, without any sort of tie to the underlying lawsuit, exposing it as a massive and entirely impermissible fishing expedition.  *See State Farm Mut. Auto. Ins. Co. v. Superior Ct. In & For Cnty. of Maricopa,* 167 Ariz. 135, 138 (Ct. App. 1991) (discovery should not be "abused by 'wild fishing expeditions.'").

Non-Party Agasi further objects to this Request because it purports to call for the production of documents or information that are neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence.  *Cornet Stores v. Superior Ct. In & For Yavapai Cnty.,* 108 Ariz. 84, 85 (1972) ("Rule 26(b), Rules of Civil Procedure, 16 A.R.S., provides that any matter relevant to the subject matter or reasonably calculated to lead to the discovery of admissible evidence is discoverable and, of course, conversely irrelevant matters or those not reasonably calculated to lead to discovery of admissible evidence are not discoverable.")

Non-Party Agasi objects to this Request to the extent that it seeks information, including financial, confidential, or other sensitive or private information, that is protected or prohibited from disclosure under applicable law, statutes, regulations, rules, case law, or any other legal authority, including, but not limited to, the right of privacy, as well as any other confidentiality rights possessed by third parties such as Agasi, OtterSec and DANS.

Non-Party Agasi objects to this Request to the extent that it seeks information or documents that are privileged or protected by the accountant-client privilege, or any other applicable privilege.  *See* Ariz. Rev. Stat. Ann. § 32-749.

## DOCUMENT REQUEST NO. 8:

All documents provided to Agasi by or on behalf of Robert Chen, OtterSec, Otter

1  Audits, RC Security or DANS for the Relevant Period.

2  **RESPONSE TO DOCUMENT REQUEST NO. 8:**

3         Nonparty Agasi objects to the Request as it violates Arizona Rules of Civil Procedure

4  45(e)(1) by "imposing undue burden or expense" on Nonparty Agasi, and by seeking the

5  production of materials "that have already been produced in the action or that are available from

6  parties to the action," without good cause.  Ariz. R. Civ. P. 45(e)(1).  Thus, Nonparty Agasi

7  objects to the Request as it requests documents that appear to be either irrelevant or almost

8  entirely duplicative of documents in the possession of one or more parties to the action.  These

9  documents could, to the extent they exist, be acquired more easily and with less expense from the

10  parties, rendering the Subpoena overly broad, unduly burdensome, and oppressively expensive to

11  respond to.  Agasi, as a nonparty, should not be put to the time and expense of producing such

12  documents or information.

13         This Request is unduly overbroad and burdensome as it seeks "*all* documents provided"

14  to Non-Party Agais, by various individuals and entities, including non-parties, over the span of

15  two years, without any sort of tie to the underlying lawsuit, exposing it as a massive and entirely

16  impermissible fishing expedition.  *See State Farm Mut. Auto. Ins. Co. v. Superior Ct. In & For*

17  *Cnty. of Maricopa,* 167 Ariz. 135, 138 (Ct. App. 1991) (discovery should not be "abused by

18  'wild fishing expeditions.'").

19         Non-Party Agasi further objects to this Request because it purports to call for the

20  production of documents or information that are neither relevant to the subject matter of this

21  action nor reasonably calculated to lead to the discovery of admissible evidence.  *Cornet Stores*

22  *v. Superior Ct. In & For Yavapai Cnty.,* 108 Ariz. 84, 85 (1972) ("Rule 26(b), Rules of Civil

23  Procedure, 16 A.R.S., provides that any matter relevant to the subject matter or reasonably

24  calculated to lead to the discovery of admissible evidence is discoverable and, of course,

25  conversely irrelevant matters or those not reasonably calculated to lead to discovery of

26  admissible evidence are not discoverable.")

27

28

Non-Party Agasi objects to this Request to the extent that it seeks information, including financial, confidential, or other sensitive or private information, that is protected or prohibited from disclosure under applicable law, statutes, regulations, rules, case law, or any other legal authority, including, but not limited to, the right of privacy, as well as any other confidentiality rights possessed by third parties such as Agasi, OtterSec and DANS.

Non-Party Agasi objects to this Request to the extent that it seeks information or documents that are privileged or protected by the accountant-client privilege, or any other applicable privilege. *See* Ariz. Rev. Stat. Ann. § 32-749.

**DOCUMENT REQUEST NO. 9:**

All documents provided by Agasi to Robert Chen, OtterSec, Otter Audits, RC Security, DANS or any of their representatives for the Relevant Period.

**RESPONSE TO DOCUMENT REQUEST NO. 9:**

Nonparty Agasi objects to the Request as it violates Arizona Rules of Civil Procedure 45(e)(1) by "imposing undue burden or expense" on Nonparty Agasi, and by seeking the production of materials "that have already been produced in the action or that are available from parties to the action," without good cause. Ariz. R. Civ. P. 45(e)(1). Thus, Nonparty Agasi objects to the Request as it requests documents that appear to be either irrelevant or almost entirely duplicative of documents in the possession of one or more parties to the action. These documents could, to the extent they exist, be acquired more easily and with less expense from the parties, rendering the Subpoena overly broad, unduly burdensome, and oppressively expensive to respond to. Agasi, as a nonparty, should not be put to the time and expense of producing such documents or information.

This Request is unduly overbroad and burdensome as it seeks "*all* documents provided" by Non-Party Agais to various individuals and entities, and their representatives, including non-parties, over the span of two years, without any sort of tie to the underlying lawsuit, exposing it as a massive and entirely impermissible fishing expedition. *See State Farm Mut. Auto. Ins. Co.*

*v. Superior Ct. In & For Cnty. of Maricopa,* 167 Ariz. 135, 138 (Ct. App. 1991) (discovery should not be "abused by 'wild fishing expeditions.'").

Non-Party Agasi further objects to this Request because it purports to call for the production of documents or information that are neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence. *Cornet Stores v. Superior Ct. In & For Yavapai Cnty.,* 108 Ariz. 84, 85 (1972) ("Rule 26(b), Rules of Civil Procedure, 16 A.R.S., provides that any matter relevant to the subject matter or reasonably calculated to lead to the discovery of admissible evidence is discoverable and, of course, conversely irrelevant matters or those not reasonably calculated to lead to discovery of admissible evidence are not discoverable.")

Non-Party Agasi objects to this Request to the extent that it seeks information, including financial, confidential, or other sensitive or private information, that is protected or prohibited from disclosure under applicable law, statutes, regulations, rules, case law, or any other legal authority, including, but not limited to, the right of privacy, as well as any other confidentiality rights possessed by third parties such as Agasi, OtterSec and DANS.

Non-Party Agasi objects to this Request to the extent that it seeks information or documents that are privileged or protected by the accountant-client privilege, or any other applicable privilege. *See* Ariz. Rev. Stat. Ann. § 32-749.

**DOCUMENT REQUEST NO. 10:**

All working papers, invoices or other documents concerning or supporting work performed or work to be performed for Robert Chen, OtterSec, Otter Audits, RC Security or DANS for the Relevant Period.

**RESPONSE TO DOCUMENT REQUEST NO. 10:**

Nonparty Agasi objects to the Request as it violates Arizona Rules of Civil Procedure 45(e)(1) by "imposing undue burden or expense" on Nonparty Agasi, and by seeking the production of materials "that have already been produced in the action or that are available from

parties to the action," without good cause.  Ariz. R. Civ. P. 45(e)(1).  Thus, Nonparty Agasi

objects to the Request as it requests documents that appear to be either irrelevant or almost

entirely duplicative of documents in the possession of one or more parties to the action.  These

documents could, to the extent they exist, be acquired more easily and with less expense from the

parties, rendering the Subpoena overly broad, unduly burdensome, and oppressively expensive to

respond to.  Agasi, as a nonparty, should not be put to the time and expense of producing such

documents or information.

This Request is unduly overbroad and burdensome as it seeks "*all* working papers"

concerning or supporting work for individuals and entities, including non-parties, over the span

of two years, without any sort of tie to the underlying lawsuit, exposing it as a massive and

entirely impermissible fishing expedition.  *See State Farm Mut. Auto. Ins. Co. v. Superior Ct. In*

*& For Cnty. of Maricopa,* 167 Ariz. 135, 138 (Ct. App. 1991) (discovery should not be "abused

by 'wild fishing expeditions.'").

Non-Party Agasi further objects to this Request because it purports to call for the

production of documents or information that are neither relevant to the subject matter of this

action nor reasonably calculated to lead to the discovery of admissible evidence.  *Cornet Stores*

*v. Superior Ct. In & For Yavapai Cnty.,* 108 Ariz. 84, 85 (1972) ("Rule 26(b), Rules of Civil

Procedure, 16 A.R.S., provides that any matter relevant to the subject matter or reasonably

calculated to lead to the discovery of admissible evidence is discoverable and, of course,

conversely irrelevant matters or those not reasonably calculated to lead to discovery of

admissible evidence are not discoverable.")

Non-Party Agasi objects to this Request to the extent that it seeks information, including

financial, confidential, or other sensitive or private information, that is protected or prohibited

from disclosure under applicable law, statutes, regulations, rules, case law, or any other legal

authority, including, but not limited to, the right of privacy, as well as any other confidentiality

rights possessed by third parties such as Agasi, OtterSec and DANS.

1    Non-Party Agasi objects to this Request to the extent that it seeks information or

2 documents that are privileged or protected by the accountant-client privilege, or any other

3 applicable privilege.  *See* Ariz. Rev. Stat. Ann. § 32-749.

4

5 Dated: November 20, 2024              KAUFHOLD GASKIN LLP

6

7                                       *Liana Mayilyan*

8                                       By:_____
                                        Liana Mayilyan

9
                                        Attorneys for Non-Party
10                                      Agasi Tax & Financial, PLLC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

# EXHIBIT 4

# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

|  |  |
|---|---|
| LI FEN YAO, as Administrator of the Estate of Sam Mingsan Chen,<br><br>                Plaintiff,<br><br>              -v-<br><br>ROBERT CHEN; OTTER AUDITS LLC; and RC SECURITY LLC,<br><br>                Defendants. | Civil Action No. TDC-23-0889 |

**PLAINTIFF'S FIRST SET OF REQUESTS FOR THE PRODUCTION OF**
**DOCUMENTS AND ELECTRONICALLY STORED INFORMATION**

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Local Rule 104 of the Local Rules of the United States District Court for the District of Maryland, and Appendix A to the Local Rules of the United States District Court for the District of Maryland, Plaintiff Li Fen Yao, as Administrator of the Estate of Sam Mingsan Chen, by her undersigned attorneys, requests that Defendants Robert Chen, Otter Audits LLC, and RC Security LLC respond to these requests within the time prescribed by the Federal Rules of Civil Procedure and produce or make available for inspection and copying the documents and electronically stored information described below within thirty (30) days following the date of service of these requests, and continuing from day to day thereafter until completed, at the offices of the undersigned attorneys for Plaintiff Li Fen Yao or at such other time and place as may be agreed upon by all counsel.

## INSTRUCTIONS

Without intending to broaden or narrow the scope of discovery permitted by the Federal Rules of Civil Procedure or the Local Rules of the United States District Court for the District of Maryland, the following instructions shall apply to these requests:

A.      The instructions set forth in the Uniform Instructions and Definitions for Use in Discovery Requests set forth in Appendix D of the Local Rules of the United States District Court for the District of Maryland are incorporated herein.

B.      These requests are directed to Defendants Robert Chen, Otter Audits LLC, and RC Security, LLC and each Defendant is required to respond pursuant to the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the District of Maryland. These requests shall be deemed continuing and, to the extent that your responses may be enlarged, diminished, supplemented or otherwise modified by documents or information acquired subsequent to your initial responses to these requests you shall promptly supplement your responses and document production accordingly.

C.      Documents requested herein shall be produced as they are kept in the usual course of business or organized and labeled to respond to the specific categories set forth in these requests and with information sufficient to indicate their source (*e.g.*, the person(s) from whom the documents were obtained).

D.      A request calling for production of any document shall be deemed to include, in addition to the document itself, a request for any and all drafts or non-identical copies of any such document, as well as all exhibits or attachments to the document and any enclosures sent or kept with the document.  Documents attached to each other shall not be separated.

E.      Unless otherwise agreed to by the parties, documents shall be produced via a file transfer protocol site, on a portable hard or flash drive or other reasonably accessible media format. Documents maintained in hardcopy shall be produced in TIFF image format with corresponding OCR text, associated data identifying the beginning and ending bates numbers and, to the extent applicable, information associating document families or attachment ranges. Electronically stored

2

documents should be produced in accordance with the Hybrid Production Protocol set forth in Appendix 2.1 of the Principles for the Discovery of Electronically Stored Information in Civil Cases in the United States District Court for the District of Maryland.

F.    Plaintiff retains the right to request to view or inspect the original of any copy of a document provided or produced in response to these requests.

G.    Unless otherwise indicated, these requests call for all documents that were applicable or created, sent, received or otherwise possessed during the Relevant Period.

## DEFINITIONS

Without intending to broaden or narrow the scope of discovery permitted by the Federal Rules of Civil Procedure or the Local Rules of the United States District Court for the District of Maryland, each of the definitions listed below shall apply to these requests.

A.    The definitions set forth in the Uniform Instructions and Definitions for Use in Discovery Requests set forth in Appendix D of the Local Rules of the United States District Court for the District of Maryland are incorporated herein.

B.    Action.  The "Action" means the above-captioned litigation, including all pleadings and proceedings filed or had therein.

C.    Answer.  The "Answer" means the Answer of Defendants in the Action, dated and filed in the United States District Court for the District of Maryland on March 25, 2024, together with any amendments thereto (including the Amended Answer of Defendants dated and filed in the United States District Court for the District of Maryland on April 12, 2024).

D.    Complaint.  The "Complaint" means the Complaint in the Action, dated and filed in the United States District Court for the District of Maryland on March 31, 2023, together with any amendments thereto.

3

E.    <u>DANS.</u>  "DANS" means Digital Asset Network Security PTE Ltd. and, where applicable, its officers, directors, members, employees, partners, corporate parents, subsidiaries, affiliates or representatives.

F.    <u>David Chen.</u> "David Chen" means David Chen, and includes any of his representatives.

G.    <u>Defendants.</u>  "Defendants" means, collectively and separately, Robert Chen, Otter Audits and RC Security and, where applicable, their officers, directors, members, employees, partners, corporate parents, subsidiaries, affiliates or representatives.

H.    <u>Estate.</u>  The term "Estate" means the Estate of Sam Mingsan Chen, and includes any of its representatives.

I.    <u>Otter Audits.</u>  "Otter Audits" means Defendant Otter Audits LLC and, where applicable, its officers, directors, members, employees, partners, corporate parents, subsidiaries, affiliates or representatives.

J.    <u>OtterSec.</u> "OtterSec" means OtterSec LLC and, where applicable, its officers, directors, members, employees, partners, corporate parents, subsidiaries, affiliates or representatives.

K.    <u>Plaintiff.</u>  "Plaintiff" means Li Fen Yao, as Administrator of the Estate of Sam Mingsan Chen, and includes any of her representatives.

L.    <u>RC Security.</u> "RC Security" means Defendant RC Security LLC and, where applicable, its officers, directors, members, employees, partners, corporate parents, subsidiaries, affiliates or representatives.

M.    <u>Relevant Period.</u> The term "Relevant Period" means February 1, 2022 through the present.

4

N.    <u>Representative.</u> The terms "representative" or "representatives" mean agents or any persons acting or purporting to act on behalf of, or in concert with, any other person.

O.    <u>Robert Chen.</u>  "Robert Chen" means Defendant Robert Chen, and includes any of his representatives.

P.    <u>Sam Chen.</u>  "Sam Chen" means Sam Mingsan Chen, and includes any of his representatives.

## DOCUMENTS TO BE PRODUCED

1.    Documents and communications concerning the formation, organization, reorganization, management or governance of RC Security, Otter Audits, OtterSec, and DANS, including documents and communications concerning certificates or articles of incorporation or formation, articles of dissolution, certificates of good standing, authorizations or approvals to do or conduct business in any jurisdiction, by-laws, shareholder agreements, operating or partnership agreements, capitalization tables, minutes of meetings, resolutions, and drafts or amendments to any of the forgoing.

2.    Documents sufficient to show all shareholders, members or partners of RC Security, Otter Audits, OtterSec, and DANS, including names, contact details, and amounts of shares, stock, membership interests or partnership interests owned by each.

3.    Documents sufficient to show all entities or businesses in which Defendants have any ownership or financial interest and the nature of any such ownership or financial interest.

4.    Documents and communications concerning the ownership or financial interest of Defendants in DANS.

5.    Documents and communications concerning all dividends or distributions paid to any shareholders, members or partners of RC Security, Otter Audits, and OtterSec.

6.    Agreements to which RC Security, Otter Audits, and OtterSec is or was a party or beneficiary.

7.    Agreements to which Robert Chen is or was a party or beneficiary that discuss, refer or relate to RC Security, Otter Audits, OtterSec or DANS, or the business of RC Security, Otter Audits, OtterSec or DANS.

8.    Documents and communications concerning the dissolution and winding-up of OtterSec, including instructions or plans for the dissolution or winding-up of OtterSec; the auction, purchase or sale of any assets; payments from or to debtors, creditors or members; papers filed with, sent to, or received from the Wyoming Secretary of State; and communications with clients,

5

customers, vendors, members, officers, directors, employees, independent contractors, consultants, personnel or other third parties.

9.      Documents and communications concerning any offers, bids, auctions, appraisals or valuations of RC Security, Otter Audits or OtterSec, any ownership interest in RC Security, Otter Audits or OtterSec, or any assets of RC Security, Otter Audits or OtterSec.

10.      Documents and communications concerning any acquihire of, investment in, or purchase, sale, transfer or acquisition of RC Security, Otter Audits or OtterSec, any ownership interest in RC Security, Otter Audits or OtterSec.

11.      Documents and communications concerning efforts to raise money, funds or capital for RC Security, Otter Audits or OtterSec,

12.      Documents and communications concerning the ownership, sale, licensing, use or right to use assets, technology, accounts, platforms, property, intellectual property, resources or infrastructure of RC Security, Otter Audits or OtterSec.

13.      Documents sufficient to show all officers, directors, employees, independent contractors, consultants or personnel of RC Security, Otter Audits and OtterSec.

14.      Documents and communications concerning agreements with, or the hiring or termination of, any officer, director, employee, independent contractor, consultant or personnel of RC Security, Otter Audits or OtterSec.

15.      Documents and communications concerning general ledgers, state and federal tax returns, financial statements, profit and loss statements, loans, expenses, payroll records, balance sheets, revenue or income, cash flow, assets, liabilities, and debt schedules for Defendants and OtterSec.

16.      Documents and communications concerning any accounts or joint accounts opened, closed or maintained by or for the benefit or use of RC Security, Otter Audits, and OtterSec with any banking, securities or other traditional financial institution, exchange, platform, application or database.

17.      Documents and communications concerning any accounts or joint accounts opened, closed or maintained by or for the benefit or use of RC Security, Otter Audits, and OtterSec with any decentralized finance institution, exchange, platform, application or database, including any accounts or joint accounts for transacting, purchasing, selling, trading or holding cryptocurrency, non-fungible tokens, cryptographic assets, smart contracts or other digital, virtual or electronic assets.

18.      Documents and communications concerning any blockchain or digital wallets opened, closed or maintained by or for the benefit or use of RC Security, Otter Audits, and OtterSec, including any custodial wallets, non-custodial wallets, software or "hot" wallets, and hardware or "cold" wallets.

19.     Documents sufficient to show all customers and clients of RC Security, Otter Audits, and OtterSec, including all persons for whom RC Security, Otter Audits, and OtterSec has performed any auditing work or from whom RC Security, Otter Audits, and OtterSec has collected any payments for services or products.

20.     Documents and communications concerning any forms W-2, 1099 or K-1 issued or required to be issued by, on behalf of, or to Defendants, OtterSec, Sam Chen, Plaintiff, the Estate or David Chen.

21.     Documents and communications concerning the ownership interests, financial interests, or rights of Robert Chen, Sam Chen, Plaintiff, the Estate or David Chen in or to RC Security, Otter Audits and OtterSec.

22.     Documents and communications concerning any business plans, opportunities or strategies for RC Security, Otter Audits, and OtterSec.

23.     Documents and communications concerning Jump Trading, Jump Crypto or any current or former officer, director, member, employee, consultant, independent contractor, partner, corporate parent, subsidiary, affiliate or representative of Jump Trading or Jump Crypto, including any meetings, offers, proposals, deals, terms, discussions, negotiations or agreements with Jump Trading, Jump Crypto or any current or former officer, director, member, employee, consultant, independent contractor, partner, corporate parent, subsidiary, affiliate or representative of Jump Trading or Jump Crypto.

24.     Documents and communications concerning this Action, including documents and communications received from or provided to any other party, third-party or representative of a party or third party.

25.     Documents and communications referenced in all pleadings filed in this Action.

26.     Documents and communications concerning all defenses and affirmative defenses of Defendants in this Action, including all defenses and affirmative defenses set forth in the Answer.

11290170.1

Dated:  April 12, 2024

CARTER LEDYARD & MILBURN LLP

By: _____
       *Stephen M. Plotnick*

    Stephen M. Plotnick, *pro hac vice*
    Madelyn K. White, *pro hac vice*
    Nathan D. Harp, *pro hac vice*

28 Liberty Street, 41st Floor
New York, New York 10005
Tel: 212.732.3200
plotnick@clm.com
white@clm.com
harp@clm.com

-and-

BARKLEY & KENNEDY

    /s/ Daniel M. Kennedy, III
By: _____

    Daniel M. Kennedy, III
(signed by Stephen M. Plotnick with the
permission of Daniel M. Kennedy, III)

51 Monroe Street, Suite 1407
Rockville, Maryland 20850
301-251-6600
dkennedy@barkenlaw.com

*Attorneys for Plaintiff Li Fen Yao*

8

11290170.1

## CERTIFICATE OF SERVICE

I certify that on April 12, 2024, I served the forgoing First Set of Requests for the

Production of Documents and Electronically Stored Information by electronic mail on counsel of

record for Defendants Robert Chen, Otter Audits LLC, and RC Security LLC.

*Stephen M. Plotnick*

_____

Stephen M. Plotnick

9